## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| ANDREW MARCH, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Docket No. 2:15-cv-515-NT |
| ) | |
| JANET T. MILLS, Attorney General ) | |
| for the State of Maine, CITY OF ) | |
| PORTLAND, WILLIAM PREIS, Police ) | |
| Lieutenant of the City of Portland, ) | |
| JASON NADEAU, Police Officer of the ) | |
| City of Portland, DONALD KRIER, ) | |
| Police Major of the City of Portland, ) | |
| GRAHAM HULTS, Police Officer of ) | |
| the City of Portland, ) | |
| ) | |
| Defendants. ) | |

### ORDER ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Before the Court is the Plaintiff's motion for a preliminary injunction pursuant to Federal Rule of Civil Procedure 65(a) (ECF No. 4). For the reasons stated below, the motion is **GRANTED**.

### BACKGROUND

This case presents the difficult question of whether a state law providing protection to women seeking access to constitutionally-protected health care violates the First Amendment rights of an individual who wishes to voice his opposition to abortion on a public sidewalk. I conclude that it does.

The plaintiff in this case is Andrew March. He is a Christian pastor and co-founder of a church in Lewiston, Maine called Cell 53. Dec. 28, 2015 March Decl. ¶ 4

("**First March Decl**.") (ECF No. 5-1). Part of the mission of Cell 53 "is to plead for the lives of the unborn at the doorsteps of abortion facilities." First March Decl. ¶ 5. March believes that "abortion is the killing of unborn citizens" and that it "harms women." First March Decl. ¶¶ 6-7. He voices his opposition to abortion outside the Planned Parenthood Portland Health Center on Congress Street in downtown Portland (the "**Health Center**"). First March Decl. ¶¶ 8-15. The Defendants in this case are the Maine Attorney General, the City of Portland (the "**City**"), and Portland law enforcement officers who interacted with March outside of the Health Center in November and December of 2015.

This is not the first lawsuit sparked by activity outside the Health Center. In 2014, abortion opponents challenged a City ordinance that created a buffer zone around the Health Center. *See Fitzgerald v. City of Portland*, 2:14-cv-53-NT, 2014 WL 5473026 (D. Me. Oct. 27, 2014). The City repealed the ordinance after the United States Supreme Court struck down a similar Massachusetts regulation in *McCullen v. Coakley*, 134 S. Ct. 2518 (2014). Following the repeal of the buffer zone, the City looked to alternative ways to address protests outside of the Health Center. Sept. 2, 2014 Memo. re: Reproductive Health Facility Protests—Buffer Zone Alternatives ("**Sept. 2, 2014 Memo**") (ECF No. 43-2). Counsel for the City advised against passing any new regulations, and instead recommended—consistent with *McCullen*—that law enforcement focus on enforcing existing laws. Sept. 2, 2014 Memo. 6 ("[T]he city should not pursue passage of any new regulations at this time. This is particularly true given the potential of another lengthy legal battle, and considering our current

2

legal expenses and pending budget challenges."); *cf. McCullen*, 134 S. Ct. at 2538 (pointing out that the state had less-intrusive, targeted laws it could enforce to address problems around clinics that would burden less speech than a generally-applicable buffer zone). One of the existing laws counsel for the City identified to address issues around the Health Center was the Maine Civil Rights Act, 5 M.R.S.A. § 4684-B.

The Maine Civil Rights Act ("**MCRA**") was enacted in 1989. In broad strokes, it creates a cause of action against any person who, "whether or not acting under color of law, intentionally interferes or attempts to intentionally interfere . . . with the exercise or enjoyment by any other person" of rights secured by the United States or Maine Constitutions or federal or state laws. 5 M.R.S.A. §§ 4681, 4682. The MCRA authorizes suit by the Attorney General or any aggrieved person. *Id.*

In 1995, the Office of the Attorney General submitted a bill to amend the MCRA by adding a section that prohibited certain conduct in and around reproductive health facilities. L.D. 1216 (117th Legis. 1995) (ECF No. 36-1). Through the legislative process, the scope of protection was expanded to cover conduct outside all buildings, rather than just reproductive health facilities. One observer noted that this change made the bill "generic or neutral . . . [t]he new bill protects all buildings and business establishments . . . including crisis pregnancy centers, pro-life groups' headquarters and offices, etc." L.D. 1216 at 29 (117th Legis. 1995). A summary of the proposed bill included a section on why it had been offered:

> The history of civil rights enforcement in this country over the past several years has demonstrated that the most extreme violence tends to

3

> occur in situations where less serious civil rights violations are permitted to escalate. When the rhetoric of intolerance and the disregard for civil rights do, in fact, escalate, then some people at the fringes of society will take that atmosphere as a license to commit unspeakable violence. The amended version of L.D. 1216 represents a commitment on the part of both sides of the abortion debate to reduce tensions in order to lessen the chances of tragic violence.

L.D. 1216 at 14 (117th Legis. 1995). As enacted, the amendment made it a violation of the MCRA to interfere or attempt to interfere with a person's civil rights by: (1) physically obstructing the entrance or exit of a building; (2) making repeated telephone calls to disrupt activities in a building; (3) setting off any device that releases "noxious and offensive odors" within a building; or (4) making noise that can be heard within a building, after having been ordered by law enforcement to stop, with the intent to jeopardize or interfere with the delivery of health services inside. 5 M.R.S.A. § 4684-B(2).

In the instant suit, March challenges the constitutionality of the noise portion of the amendment, which reads:

> 2. **Violation.** It is a violation of this section for any person, whether or not acting under color of state law, to intentionally interfere or attempt to intentionally interfere with the exercise or enjoyment by any other person of rights secured by the Constitution of Maine or laws of the State by any of the following conduct:
> D. After having been ordered by a law enforcement officer to cease such noise, intentionally making noise that can be heard within a building and with the further intent either:
> (1) To jeopardize the health of persons receiving health services within the building; or
> (2) To interfere with the safe and effective delivery of those services within the building.

4

5 M.R.S.A. § 4684-B(2)(D) (the "**Noise Provision**").[1]

March filed suit in December of 2015, along with a motion for a preliminary injunction. Compl. (ECF No. 1); Pl.'s Mot. for Prelim. Inj. (ECF No. 4). He later filed an amended complaint. First Am. Compl. (ECF No. 30). The parties declined to exchange discovery or present evidence through a hearing in connection with the preliminary injunction motion, and instead simply chose to present their positions through oral argument. Report of Hr'g & Order Re: Scheduling (ECF No. 46). The parties also submitted supplemental briefing to address additional questions raised at oral argument. Thus, the evidence at my disposal is limited to the declarations, videos, and additional documents the parties attached as exhibits to their preliminary injunction briefing.

## FACTUAL FINDINGS

The Health Center is located on the second floor of a building on Congress Street, a loud and busy thoroughfare. First March Decl. ¶¶ 10, 22; Feb. 22, 2016 March Decl. ¶ 6 ("**Second March Decl.**") (ECF No. 43-5). The Health Center relocated to Congress Street in September of 2011. Feb. 8, 2016 Healey Aff. ¶ 4 ("**Healey Aff.**") (ECF No. 38). After this relocation, protesters opposed to abortion began to congregate on the sidewalk in front of the entrance to the Health Center. Healey Aff. ¶ 5. Approximately a dozen protesters would gather along the sidewalk

---

[1]    "Building" is defined as "any structure having a roof or a partial roof supported by columns or walls that is used or intended to be used for shelter or enclosure of persons or objects regardless of the materials of which it is constructed." 5 M.R.S.A. § 4684-B(1)(A). "Health service" is defined as "any medical, surgical, laboratory, testing or counseling service relating to the human body." *Id.* at § 4684-B(1)(B).

carrying signs, handing out literature, and attempting to engage in conversation with individuals entering the building. Healey Aff. ¶ 7. In response to these protests, the Health Center implemented a "greeter program" whereby volunteers would stand outside of the facility to escort patients past the protesters into the Health Center. Healey Aff. ¶ 6. The Health Center also hired City police officers to stand outside to ensure that patients could safely enter and exit the facility. Healey Aff. ¶ 6.

Although protesters had gathered on the sidewalk outside of the Health Center for years, they generally could not be heard within the facility. Healey Aff. ¶ 26. But after the City repealed the buffer zone ordinance around the Health Center, the protesters became much louder. Healey Aff. ¶¶ 8-9. One protester, Brian Ingalls, began yelling disruptively outside of the Health Center, occasionally yelling directly at patients inside the facility. Healey Aff. ¶ 10. At times, his yelling could be heard inside the Health Center's waiting room, counseling rooms, and an exam room. Healey Aff. ¶ 11. In the counseling rooms, employees obtain patients' medical histories, take vital signs, discuss treatment options, potential risks, complications, and side-effects. Healey Aff. ¶ 12. Employees also explain what a patient should expect post-procedure and what at-home care the patient may require, while also answering questions and ensuring that the patient has provided informed consent to the treatment. Healey Aff. ¶ 12. Medical examinations and procedures are performed in the Health Center's exam rooms. Healey Aff. ¶ 13.

Loud and sustained yelling that is audible within the Health Center interferes with the Health Center's staff's ability to provide care to their patients. Healey Aff. ¶ 15. This noise is problematic because:

- To effectively deliver health services, staff need a calm and quiet environment for their interactions with patients. Healey Aff. ¶ 14. Effective communication between Health Center staff and patients is essential because of the importance of obtaining accurate information regarding patients' "medical histor[ies], allergies, and other issues that may impact . . . medical care." Feb. 8, 2016 Dowling Aff. ¶ 8 ("**Dowling Aff.**") (ECF No. 35).

- It is essential that patients fully understand and retain the information provided to them by the Health Center regarding their medical procedure. Health Center staff need to explain to patients "the various symptoms they may experience after they leave [the] facility, including which symptoms are to be expected and which symptoms are abnormal." Dowling Aff. ¶ 10. If a patient does not understand or retain this information, the medical repercussions can be significant. Dowling Aff. ¶ 10.

- It becomes very difficult to communicate with patients when protesters are loud enough that they can be heard inside the building. The loud noise distracts patients and renders them unable to concentrate on their discussions with staff. This in turn causes staff to spend more time repeating instructions to patients, which causes additional delays for the entire facility. Dowling Aff. ¶¶ 11-12

- "When abortion procedures are delayed, the medical risks associated with such procedures increase." Dowling Aff. ¶ 13; *see also* Healey Aff. ¶ 20. At least one patient requested that her appointment be postponed to a later date "because of the disruptive effect of noise." Dowling Aff. ¶ 13.

- "[D]elays have an escalating effect throughout the facility" because they impact all patients waiting for care. Dowling Aff. ¶ 15. "The longer patients wait, the longer they are subjected to the loud shouting of protesters, with a corresponding increase in their agitation and emotional distress." Dowling Aff. ¶ 15.

- Loud noise from outside the building has a physiological effect on patients, causing "additional stress and elevated blood pressure, pulse, and respiratory rates." Healey Aff. ¶ 16. Such physical effects interfere with medical care because patients require "additional evaluation and treatment." This also can lead to treatment being delayed. Healey Aff. ¶ 16.

- The Health Center provides "many patients with anti-anxiety medications prior to abortion procedures." Healey Aff. ¶ 18. When patients are subjected to noise from protesters on the sidewalk, staff often have to "give patients multiple doses of medication until the[ir] anxiety is under control." Healey Aff. ¶ 18. Providing these additional doses can result in further delay of care. Healey Aff. ¶ 18.

- Transitory noise produced by parades, sirens, and car horns have the potential to disrupt medical care. However, those noises are normally brief in duration and any disruption dissipates quickly. "[U]nabated constant noise" that is specifically directed at patients "is uniquely disruptive" to the Health Center's ability to provide medical care. Healey Aff. ¶¶ 29-30.

Furthermore, such noise often causes patients to complain to staff and ask to move to other areas of the Health Center where the noise is less audible. Healey Aff. ¶ 22. The Health Center has tried to mitigate the impact of noise on their patients by relocating exam rooms and moving patients into recovery areas where the noise is less audible. This can be problematic, however, because patients are then separated from people who are there to support them, as recovery areas are restricted to patients and staff. Healey Aff. ¶ 28.

The Health Center contacts the police when at least two staff members determine that the noise level outside has reached a point where it is having an impact on patients and interfering with the staff's ability to provide medical care. Healey Aff. ¶ 23. Typically, the responding police officer will enter the Health Center to verify the noise level before taking any action.[2] Healey Aff. ¶ 24. The Health Center called the police on multiple occasions after Ingalls repeatedly yelled and screamed directly at patients inside the Health Center. Healey Aff. ¶ 10.

---

[2]     The parties dispute whether the noise level was verified by police on the instances where the Health Center lodged complaints against March. *See* pg. 10 n.4 *infra*.

In October of 2015, the Attorney General's Office brought an action against Ingalls under the MCRA. Feb. 8, 2016 Robbin Aff. ¶ 4 ("**Robbin Aff.**") (ECF No. 37). Since the MCRA was enacted in 1995, the Attorney General's Office has filed 12 other actions relating to incidents around clinics that provide abortion and family planning services. Robbin Aff. ¶ 5. Ten actions have been filed to protect abortion protesters' First Amendment rights and two actions have been brought against abortion protesters. Robbin Aff. ¶ 5. The Ingalls case is the first instance in which the Attorney General's Office has brought a case under the Noise Provision of the MCRA. *See* Robbin Aff. ¶ 6.

After the State sued Ingalls under the MCRA, March began preaching on the public sidewalk in front of the Health Center. First March Decl. ¶ 11. He preaches from the sidewalk so he can effectively reach his intended audience of women and employees before they enter the Health Center. First March Decl. ¶¶ 20-21. The parties' affidavits conflict on whether March ever shouted, but he was loud enough to be heard within the Health Center on three occasions.[3] He does not engage in group chanting or use an amplification device while preaching outside of the Health Center. First March Decl. ¶¶ 12-15.

---

[3]      Healey avers that on November 6, December 4, and December 11, 2015, March could be heard within the building and was disrupting patient care. Feb. 8, 2016 Healey Aff. ¶ 25 ("**Healey Aff.**") (ECF No. 38). March does not dispute that he could be heard within the building, but he does argue that he was "peacefully" preaching on those dates. Dec. 28, 2015 March Decl. ¶¶ 27, 50, 61 ("**First March Decl.**") (ECF No. 5-1). Sneddon claims that March peacefully preaches at a normal volume and was not excessively loud on November 6, 2015. Dec. 28, 2015 Sneddon Decl. ¶¶ 6, 12 ("**First Sneddon Decl.**") (ECF No. 5-2). Leen asserts that March never shouts or yells, that he was "peacefully preaching" on November 6 and December 4, and that he was "preaching" on December 11, 2015. Dec. 29, 2015 Leen Decl. ¶¶ 6, 19, 29, 36 ("**Leen Decl.**") (ECF No. 5-3).

On November 6, 2015, March was approached by Defendant Nadeau and another police officer while he was preaching on the sidewalk outside of the Health Center. First March Decl. ¶¶ 27-28. Officer Nadeau informed March that he had received a complaint from a Health Center employee who said that March could be heard within the building. First March Decl. ¶ 29. The parties dispute whether the police officers verified whether March could be heard inside the building.[4] When March asked Officer Nadeau for an objective volume at which he could speak, Officer Nadeau informed him that there was no objective volume and that the law was based on whether Health Center employees could hear him inside. First March Decl. ¶ 32. After March again asked Officer Nadeau for an objective standard, he requested that March keep his voice down so they cannot hear him inside. Pl.'s Ex. B (ECF No. 9).

An officer approached March later that day and handed him a copy of the MCRA. First March Decl. ¶¶ 41-42. The officer informed March that he was officially being warned under the MCRA. First March Decl. ¶ 45. After March was officially warned, he spoke at a quieter volume, but this made it more difficult for him to convey his pro-life message over the noise on Congress Street. First March Decl. ¶ 47. March feared he would be completely banned from speaking on the sidewalk. First March Decl. ¶ 48.

---

[4]    Healey asserts that typically the police verify the noise level before taking any action, and that the police likely verified March's volume on all three occasions that they spoke to March. Healey Aff. ¶¶ 24, 25. March and Leen assert "upon information and belief" that the police officers who approached him on November 6, 2015 did not confirm that his voice could be heard inside the building. First March Decl. ¶ 30; Leen Decl. ¶ 21.

On December 4, 2015, March was again preaching on the sidewalk in front of the Health Center when Defendant Lieutenant Preis told him to lower his voice. First March Decl. ¶¶ 50-51. Earlier in the day, a climate change march, which included hundreds of people shouting and chanting in unison, had passed in front of the Health Center on Congress Street. First March Decl. ¶ 25. March asked Lieutenant Preis why the much louder climate change protest was permissible but his preaching was not. First March Decl. ¶ 52. Lieutenant Preis explained to March that the MCRA applies if Health Center staff can articulate that noise, and specifically the type of speech and what is said, is interfering with a medical procedure. Pl.'s Ex. F (ECF No. 9). Lieutenant Preis acknowledged that the standard was "very grey" and that other noises may be louder than March. First March Decl. ¶ 55; Pl.'s Ex. F. March asked Lieutenant Preis if the content of his speech was the problem, and Preis said that it was a combination of things. Pl.'s Ex. F. March responded that, what Lieutenant Preis had just said to him was that it was not necessarily his volume that was the problem, but the content of what he was saying. Pl.'s Ex. F. Lieutenant Preis again explained that the MCRA applies if the noise that someone makes, which could be content, interferes with the ability of somebody to deliver medical services. Pl.'s Ex. F. March's interaction with Preis made him fear that he would be sued for preaching on the sidewalk. First March Decl. ¶ 60.

On December 11, 2015, March was again preaching outside of the Health Center. Second March Decl. ¶ 1. A Health Center employee came down to the sidewalk and told Defendant Officer Hults that March could be heard upstairs.

Second March Decl. ¶ 2. After going upstairs to confirm the employee's allegation, Officer Hults gave March the "thumps up sign," which March interpreted to mean he could continue to speak at the same volume. Second March Decl. ¶ 4. Approximately 20 minutes later, a Health Center employee came back downstairs and spoke with Officer Hults. Second March Decl. ¶ 6. After speaking with the employee, Officer Hults told March to quiet down.[5] First March Decl. ¶¶ 61-62. He also told March he could be charged with disorderly conduct. First March Decl. ¶ 66.

On other occasions, individuals outside of the Health Center have been louder than March and other pro-life advocates. For instance, an unidentified man often loudly plays guitar and sings down the road in front of the Health Center. Dec. 29, 2015 Leen Decl. ¶¶ 15-16 ("**Leen Decl.**") (ECF No. 5-3). In October of 2015, a woman yelled at Ingalls outside of the Health Center for approximately five minutes. Feb. 20, 2016 Hebert Decl. ¶¶ 12-13 ("**Hebert Decl.**") (ECF No. 43-3). The woman was not cited under the MCRA. Hebert Decl. ¶¶ 14-15. On or about December 18, 2015, another woman loudly yelled and cursed at March on the sidewalk outside of the Health Center. Leen Decl. ¶¶ 17-18. March asked a nearby police officer if the woman's behavior violated the MCRA, and the officer said that the woman had a right to free speech. Leen Decl. ¶ 17. And pro-choice advocates frequently yell and scream at pro-life advocates outside of the Health Center for up to ten minutes at a time. Hebert Decl. ¶¶ 20-23.

---

[5]     March also attests that Officer Hults did not reconfirm that he could be heard within the Health Center on December 11, 2015. Second March Decl. ¶ 7.

Since March filed a motion for a preliminary injunction on December 30, 2015, he has continued to preach on the sidewalk outside of the Health Center. On January 8, 2016, March stood on a milk crate outside of the Health Center and spoke to passers-by and a group of protesters. Robbin Aff. ¶ 7; *see* Ex. A to Robbin Aff. (ECF No. 37-1). March could be heard by those in his vicinity even though he did not yell or raise his voice. Robbin Aff. ¶ 7. Likewise, on January 28, 2016, March again stood on a milk crate on the sidewalk outside of the Health Center for an hour to an hour and a half and spoke about his opposition to abortion. Healey Aff. ¶ 27. Although March could be heard by others on the sidewalk, the Health Center did not complain to the police because he could not be heard inside the building. Healey Aff. ¶ 27.

## DISCUSSION

The Plaintiff challenges the Noise Provision as a violation of the First and Fourteenth Amendments, both facially and as-applied. Because I find that the Plaintiff is likely to succeed on his claim that the Noise Provision is facially unconstitutional, I do not go on to consider the as-applied challenge.

## I.    Legal Standard for Injunctive Relief and Burdens of Proof

A plaintiff seeking a preliminary injunction must demonstrate: "(1) a likelihood of success on the merits, (2) a likelihood of irreparable harm absent interim relief, (3) a balance of equities in the plaintiff's favor, and (4) service of the public interest." *Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc.*, 794 F.3d 168, 171 (1st Cir. 2015). The First Circuit has described likelihood of success on the merits as "the main bearing wall" of the preliminary injunction standard. *Ross-Simons of Warwick,*

*Inc. v. Baccarat, Inc.*, 102 F.3d 12, 16 (1st Cir. 1996); *accord Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 10 (1st Cir. 2013).

As the party seeking a preliminary injunction the Plaintiff bears the overall burden of showing a likelihood of success on the merits. *Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656, 666 (2004). In the First Amendment context, the moving party must make an initial showing that the challenged law infringes on First Amendment rights. *See Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 294 n.5 (1984). If a plaintiff makes this initial showing, then the burden shifts to the government to justify its regulation on speech. *See Ashcroft*, 542 U.S. at 666; *see also Thalheimer v. City of San Diego*, 645 F.3d 1109, 1115 (9th Cir. 2011) ("Courts asked to issue preliminary injunctions based on First Amendment grounds face an inherent tension: the moving party bears the burden of showing likely success on the merits—a high burden if the injunction changes the status quo before trial—and yet within that merits determination the government bears the burden of justifying its speech-restrictive law.").

## II. Likelihood of Success on the Merits

### A. Legal Background

#### 1. Facial Challenge

Generally, a plaintiff mounting a facial attack must meet the demanding burden of "establish[ing] 'that no set of circumstances exists under which [the law] would be valid.' "*United States v. Stevens*, 559 U.S. 460, 472 (2010) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). In the First Amendment context, however, this requirement is refined: a plaintiff can attack a law on its face by arguing

that it "do[es] not have 'a plainly legitimate sweep.' "[6] *Showtime Entm't, LLC v. Town of Mendon*, 769 F.3d 61, 70 (1st Cir. 2014) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008)). In addressing the facial challenge, I focus "not on the historical facts of how the statute has been applied," but on the text of the law itself. *McGuire v. Reilly*, 386 F.3d 45, 57 (1st Cir. 2004).

### 2.    Framework for Analysis Under the First Amendment

The First Amendment, applicable to the States through the Fourteenth Amendment, provides that "Congress shall make no law . . . abridging the freedom of speech[.]" U.S. Const. amend. I. "Freedom of speech 'is the matrix, the indispensable condition, of nearly every other form of freedom.' " *McGuire v. Reilly*, 260 F.3d 36, 42 (1st Cir. 2001) [hereinafter *McGuire I*] (quoting *Palko v. Connecticut*, 302 U.S. 319, 327 (1937) (Cardozo, J.)). Freedom of speech, however, is not an absolute right. At times, it must be weighed against other rights and legitimate interests that the state seeks to protect, and "[t]his balance may be weighted differently . . . depending upon the nature of the restriction that the government seeks to foster." *Id.*

The well-recognized framework for addressing the constitutionality of the Noise Provision turns on three considerations: (1) whether the First Amendment protects the speech at issue; (2) the nature of the forum; and (3) the appropriate level of scrutiny. *See Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797

---

[6]       A party may also mount a second type of facial challenge to a statute under the overbreadth doctrine. Under this standard, "[a] facial challenge may . . . succeed where even though 'one or more valid application exists, the law's reach nevertheless is so elongated that it threatens to inhibit constitutionally protected speech.' " *Showtime Entm't, LLC v. Town of Mendon*, 769 F.3d 61, 70 n.7 (1st Cir. 2014) (quoting *McGuire v. Reilly*, 260 F.3d 36, 47 (1st Cir. 2001)). Here, the Plaintiff does not raise an overbreadth challenge.

(1985). It is undisputed that the Plaintiff's speech is protected under the First Amendment[7] and that the Noise Provision restricts speech in a public forum. Traditional public fora—such as sidewalks, streets, and parks—"occupy a 'special position in terms of First Amendment protection' because of their historic role as sites for discussion and debate." *McCullen*, 134 S. Ct. at 2529 (quoting *United States v. Grace*, 461 U.S. 171, 180 (1983)). Given this importance, the government's ability to regulate speech in these fora is highly constrained. *Id*. at 2529.

Turning to the third factor, the proper level of scrutiny depends on whether the law is content-based or content-neutral. The government may not "inhibit, suppress, or impose differential content-based burdens on speech." *McGuire I*, 260 F.3d at 42. Such restrictions are generally impermissible because they "pose a high risk that the sovereign is, in reality, seeking to stifle unwelcome ideas rather than to achieve legitimate regulatory objectives." *Id*. Given this high risk, content-based restrictions are subject to strict scrutiny. *See R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 386 (1992). Under this exacting standard, the law "must be the least restrictive means of achieving a compelling state interest." *McCullen*, 134 S. Ct. at 2530. "If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative." *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000). Although content-based restrictions are presumed

---

[7]    Only a few categories of speech are not protected by the First Amendment. These categories include obscenity, defamation, fraud, incitement, and speech integral to criminal conduct. *See United States v. Stevens*, 559 U.S. 460, 468 (2010).

unconstitutional, *R.A.V.*, 505 U.S. at 382, such restrictions can survive in rare cases. *See, e.g., Williams-Yulee v. Fla. Bar*, 135 S. Ct. 1656, 1665 (2015).

"[W]hen a statute does not regulate speech per se, but, rather, restricts the time, place, and manner in which expression may occur," judicial review is more lenient. *McGuire I*, 260 F.3d at 43. These "laws are less threatening to freedom of speech because they tend to burden speech only incidentally, that is, for reasons unrelated to the speech's content or the speaker's viewpoint." *Id.* Accordingly, while content-based restrictions are presumed unconstitutional, content-neutral time, place, and manner restrictions "enjoy a presumption of constitutionality." *Naser Jewelers, Inc. v. City of Concord*, 513 F.3d 27, 33 (1st Cir. 2008). Such restrictions are subject to intermediate scrutiny. *See Turner Broad. Sys., Inc. v. FCC.*, 512 U.S. 622, 642 (1994). Under this standard, the government must demonstrate that the restriction "is 'narrowly tailored to serve a significant governmental interest, and that [it] leave[s] open ample alternative channels for communication of the information.' " *Cutting v. City of Portland*, 802 F.3d 79, 84 (1st Cir. 2015) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)).

As evidenced by the number of sharply divided Supreme Court cases on the topic, determining whether an ordinance is content-neutral or content-based is tricky,[8] and abortion protest cases are uniquely challenging. Two recent Supreme Court cases—*McCullen* and *Reed*—shed light on this difficult inquiry.

---

[8]     *See Turner Broad. Sys., Inc. v. FCC.*, 512 U.S. 622, 642 (1994) ("Deciding whether a particular regulation is content based or content neutral is not always a simple task."); s*ee also City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986) (applying content-neutral standard to a law that applied

### a. *McCullen*

The Supreme Court addressed the constitutionality of a Massachusetts law which established buffer zones around abortion facilities in *McCullen*. The law provided:

> No person shall knowingly enter or remain on a public way or sidewalk adjacent to a reproductive health care facility within a radius of 35 feet of any portion of an entrance, exit or driveway of a reproductive health care facility or within the area within a rectangle created by extending the outside boundaries of any entrance, exit or driveway of a reproductive health care facility in straight lines to the point where such lines intersect the sideline of the street in front of such entrance, exit or driveway.

Mass. Gen. Laws, ch. 266, § 120E½(b) (West 2012), *invalidated by McCullen*, 134 S. Ct. at 2541, *repealed by* 2014 Mass. Legis. Serv. Ch. 197 (S.B.2283) (West). The law defined a "reproductive health care facility" as "a place, other than within or upon the grounds of a hospital, where abortions are offered or performed." *Id.* § 120E½(a). And the law exempted:

> (1) persons entering or leaving such facility; (2) employees or agents of such facility acting within the scope of their employment; (3) law enforcement, ambulance, firefighting, construction, utilities, public works and other municipal agents acting within the scope of their employment; and (4) persons using the public sidewalk or street right-of-way adjacent to such facility solely for the purpose of reaching a destination other than such facility.

*McCullen*, 134 S. Ct. at 2526 (citation and internal quotation marks omitted).

The Court first found that the law was facially content-neutral because it did "not draw content-based distinctions on its face[,]" nor "require[] 'enforcement

---

only to theaters showing films with sexually explicit content because law was aimed at the secondary effects of adult theatres on the surrounding community).

authorities' to 'examine the content of the message that is conveyed to determine whether' a violation has occurred." *Id.* at 2531 (quoting *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 383 (1984)). A violation of the law did not depend on *what* was said, but rather *where* it was said. *See id.* ("[P]etitioners can violate the Act merely by standing in a buffer zone, without displaying a sign or uttering a word.").

The fact that the law only established buffer zones outside of clinics that performed abortions did not render the law content-based. Although this limitation had "the 'inevitable effect' of restricting abortion-related speech more than speech on other subjects[,]" the Court explained that "a facially neutral law does not become content based simply because it may disproportionately affect speech on certain topics." *Id.* Rather, " '[a] regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others.' " *Id.* (quoting *Ward*, 491 U.S. at 791). Because the State's asserted justifications for the law—public safety, promoting access to healthcare, and the unobstructed use of sidewalks and roadways—were content-neutral, the Court applied (and ultimately struck down) the law under intermediate scrutiny. *Id.* at 2532-34.

The Court likewise rejected the argument that the law's exemptions rendered it viewpoint based. While acknowledging that exemptions can be problematic at times, the Court found that the record did not show that the exemptions for clinic employees and their agents were an attempt by the State to favor one side of the abortion debate over the other. *Id.* at 2533. To the extent that the record reflected

instances where escorts acted outside of the scope of their employment by "thwart[ing] petitioners' attempts to speak and hand literature to" women inside the buffer zones, the Court noted that those allegations might amount to a claim for selective enforcement. *McCullen*, 134 S. Ct. at 2533.

### b.    *Reed*

The Supreme Court's most recent case examining the distinction between content-based and content-neutral laws is *Reed v. Town of Gilbert,* 135 S. Ct. 2218 (2015). *Reed* involved a municipal sign code that regulated where and how various signs could be placed within the Town. For example, "Ideological Sign[s]" were permitted to be 20 square feet in area and allowed "in all zoning districts without time limits," but "Political Sign[s]" were only allowed to be "up to 16 square feet on residential property and up to 32 square feet on nonresidential property, undeveloped municipal property, and rights-of-way." *Id.* at 2224 (citation and internal quotation marks omitted).  "Temporary Directional Signs Relating to a Qualifying Event" were limited to six square feet and were only permitted on "private property or on a public right-of-way," and only four signs could be "placed on a single property at any time." *Id.* at 2225.

After a small local church was twice cited for violating the sign code for placing too many temporary signs in a public right-of-way, it brought suit to challenge the law on First Amendment grounds. *See id.* The Ninth Circuit, agreeing with the District Court, held that the sign code "was content-neutral because the Town 'did not adopt its regulation of speech [based on] disagree[ment] with the message conveyed,' and its justifications for regulating temporary directional signs were

'unrelated to the content of the sign.' " *Id.* at 2227 (quoting *Reed v. Town of Gilbert,* 707 F.3d 1057, 1071-72 (9th Cir. 2013)).

The Supreme Court disagreed. Writing for the Court, Justice Thomas explained:

> Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed. This commonsense meaning of the phrase "content based" requires a court to consider whether a regulation of speech "on its face" draws distinctions based on the message a speaker conveys. Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose. Both are distinctions drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny.

*Id.* at 2227 (internal citations omitted). Applying this standard, the Court held that the Town's sign code was "content based on its face" because whether it applied "depend[ed] entirely on the communicative content of the sign" in question. *Id.* Simply put, "the Church's signs inviting people to attend its worship services [were] treated differently from signs conveying other types of ideas." *Id.* Accordingly, the constitutionality of the code needed to be assessed under strict scrutiny.

The Court found that the Ninth Circuit overlooked "the crucial first step in the content-neutrality analysis" by failing to consider whether the law was content-based on its face. *Id.* at 2228. If a law is content-neutral on its face, a court may go on to examine the government's justification for the law to determine whether an improper legislative intent exists. But "a law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." *Id.* (quoting

*Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429 (1993)). Thus, "an innocuous justification cannot transform a facially content-based law into one that is content neutral." *Id.* Given that the sign code was content-based on its face, the Town's justifications for enacting it were irrelevant. *Id.* Applying strict scrutiny, the Court struck down the sign code. *Id.* at 2232.

**B.    Application of Law**

**1.    Whether the Noise Provision is Content-Based or Content-Neutral on its Face**

As *Reed* makes clear, I must first determine whether the Noise Provision draws content-based distinctions on its face before considering the State's justification for its enactment. In arguing that the law is facially content-based, the Plaintiff focuses primarily on the portion of the Noise Provision that restricts making noise with the intent "[t]o interfere with the safe and effective delivery of [health services]." 5 M.R.S.A. § 4684-B(2)(D)(2). According to the Plaintiff, this language demonstrates that the Noise Provision is content-based because it disfavors "oppositional" speech. Pl.'s Reply in Support of Mot. for Prelim. Inj. 3 ("**Pl.'s Reply**") (ECF No. 43).

As noted above, the *Reed* Court observed that: "Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose." 135 S. Ct. at 2227. The Noise Provision applies only to individuals who intentionally make noise that can be heard within a building with the "intent . . . [t]o jeopardize the health of persons receiving health services . . . or . . . interfere with the safe and effective delivery of those services." 5 M.R.S.A. § 4684-B(2)(D)(1)-(2). The application

22

of the Noise Provision turns both on the mode or method of expression (i.e., the volume) *and* on the purpose of the noise (i.e., to disrupt). In other words, the Noise Provision regulates noise, in part, by its function or purpose. Outside a health care facility that performs abortions, a pro-life protester's activity would be treated differently under the Noise Provision than a pro-choice protester's activity. Conversely, outside a crisis pregnancy counseling center, a pro-choice protester's noise would be treated differently than a pro-life protester's noise. The difference in treatment is based on the message expressed.[9]

In *McCullen*, the Court stated that a statute "would be content based if it required 'enforcement authorities' to 'examine the content of the message that is conveyed to determine whether' a violation has occurred."134 S. Ct. at 2531 (quoting *League of Women Voters of Cal.*, 468 U.S. at 383). Here, where there is protest involving speech, authorities would need to examine the content of that speech to determine whether the speaker is in violation of the Noise Provision. As the State concedes, "[t]he fact that a person shouting loudly outside a reproductive health clinic is expressing views against abortion is evidence that the person is attempting to

---

[9]     The State contends that the Noise Provision is content-neutral because it is not limited to individuals expressing pro-life messages. *See* State Def.'s Opp'n 14 ("**Def.'s Opp'n**") (ECF No. 34). But contrary to the State's argument, the fact that the Noise Provision would apply equally to pro-choice protestors outside of a pro-life crisis pregnancy counseling center only demonstrates that it is not viewpoint-based, not that it is content-neutral. Viewpoint-based restrictions on speech are "an egregious form of content discrimination" because they "target[] not subject matter, but particular views taken by speakers on a subject." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995). The fact that the Noise Provision would apply equally to speakers on both sides of the debate does not render it content-neutral. *See Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2230 (2015) ("[A] speech regulation targeted at specific subject matter is content based even if it does not discriminate among viewpoints within that subject matter."). Although the Plaintiff asserted in briefing that the Noise Provision was viewpoint-based, at oral argument Plaintiff's counsel indicated that she was withdrawing that argument.

interfere with the delivery of medical services inside the facility." State Def.'s Opp'n 15 ("**Def.'s Opp'n**") (ECF No. 34). On the other hand, a person who screams back at pro-life protestors would not be in violation of the Noise Provision since she would lack the requisite intent to interfere with delivery of medical services.[10]

The State cites *Hill v. Colorado*, 530 U.S. 703 (2000), another abortion buffer zone case, for the proposition that a law can be content neutral even if it allows authorities to look "at the content of an oral or written statement in order to determine whether a rule of law applies to a course of conduct." Def.'s Opp. 15 n.9 (citing *Hill*, 530 U.S. at 721). In *Hill*, pro-life "sidewalk counselors" challenged a law that banned any approach within eight feet of a person "for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education, or counseling." 530 U.S. at 707 (citation and quotation marks omitted). The law applied "to all . . . demonstrators whether or not the demonstration concern[ed] abortion." *Id.* at 725. Although Justice Stevens recognized that "[t]heoretically . . . cases may arise in which it is necessary to review the content of the statements made by a person approaching . . . an unwilling listener  to determine whether the approach is covered by the statute[,]" he reasoned that this "kind of cursory examination" would not be

---

[10]    The Maine Supreme Judicial Court's decision in *State v. Janisczak*, 579 A.2d 736 (Me. 1990) lends support to my conclusion that the Noise Provision is content-based. There, the court analyzed the validity of Maine's obstructing government administration statute in light of a First Amendment challenge. At the time, the statute provided that a person "is guilty of obstructing government administration if he . . . engages in any criminal act with the intent to interfere with a public servant performing or purporting to perform an official function." 17–A M.R.S.A. § 751 (1983), *amended by* P.L. 1997, ch. 351, § 2 and P.L. 2003, ch. 657, § 5. The court reasoned that, because the law "applies only where the violator's intention is to obstruct government officials in the course of their duty, an application of this statute to verbal protests cannot be deemed content-neutral." *Janisczak*, 579 A.2d at 739 n.6. As a result, the court held that "the time, place, and manner test for the constitutionality of content-neutral restrictions on speech" was inapplicable. *Id.*

problematic. *Id.* at 721-22. But Justice Stevens also wrote: "it is unlikely that there would often be any need to know exactly what words were spoken in order to determine whether 'sidewalk counselors' are engaging in 'oral protest, education, or counseling' rather than pure social or random conversation." *Id.* at 721. In context, it is clear that Justice Stevens's "cursory examination" was to determine the broad category of speech at issue: whether this was a social interaction or an oral protest. The type of examination that the Noise Provision invites is more extensive: whether the speaker outside a health facility that performs abortions was expressing a pro-choice message or an anti-abortion message. Thus, even under *Hill*, the Noise Provision is content-based because "its application turns on the *substance* of a communication," not merely "the mode or method of expression." *Bruni v. City of Pittsburgh*, 91 F. Supp. 3d 658, 668 (W.D. Pa. 2015).

Citing *Wisconsin v. Mitchell*, 508 U.S. 476 (1993), the State contends that it is permissible to "[c]onsider[] a speaker's words in determining the speaker's intent" without implicating the First Amendment. Def.'s Opp'n 15 n.9. In *Mitchell*, the Supreme Court dealt with a Wisconsin statute that enhanced criminal sentences for defendants who intentionally selected their victims based on "race, religion" or other protected categories. 508 U.S. at 480. The defendant argued—and the Wisconsin Supreme Court agreed—that the statute violated the First Amendment because it punished "offenders' bigoted beliefs." *Id.* at 485. The Supreme Court held that the law survived the defendant's First Amendment challenge, reasoning that the law was not directed at protected expression itself, but rather overt criminal conduct that was

unprotected by the First Amendment. *Id.* at 487. The State has not advanced an argument that the speech targeted by the Noise Provision is unprotected under the First Amendment. Thus, the State's reliance on *Mitchell* is not persuasive.

The State contends that the Noise Provision is content-neutral because it "applies equally to <u>all</u> noise" and that it is "indifferent as to the nature or content of the noise." Def.'s Opp'n 13. The State cites *Medlin v. Palmer*, 874 F.2d 1085 (5th Cir. 1989), where the Fifth Circuit held that an ordinance that banned the use of loudspeakers within a certain proximity to medical facilities was content-neutral because it "merely prohibit[ed] amplified speech within 150 feet of certain facilities without regard for what [was] being said." *Id.* at 1090. Yet, unlike the ordinance at issue in *Medlin* and contrary to the State's characterization, the Noise Provision does not ban <u>all</u> noise; it bans only noise made with the "intent . . . [t]o jeopardize the health of persons receiving health services . . . or . . . interfere with the safe and effective delivery of those services." 5 M.R.S.A. § 4684-B(2)(D)(1)-(2). Thus, the Noise Provision targets a subset of loud noise—noise made with the intent to jeopardize or interfere—and treats it less favorably.

The State also argues that the Noise Provision can be violated by conduct that has no communicative content. As an example, the State posits that a person playing a drum loudly "outside a medical facility with the intent to interfere with the provision of medical services would be in violation of the statute even though the noise being made expresses no message at all." Def.'s Opp'n 14-15. It is certainly true that there are ways to violate the statute that do not involve pure speech. But it is

also true that a person playing a drum is expressing a message. *Clark*, 468 U.S. at 294 ("[A] message may be delivered by conduct that is intended to be communicative and that, in context, would reasonably be understood by the viewer to be communicative."). This message is what triggers the Noise Provision, whether it is delivered verbally or by expressive conduct.

Finally, in arguing that the Noise Provision is content-neutral, the State relies heavily on the MCRA's benign legislative history, contending that the fact that pro-life groups supported the enactment of the 1995 MCRA amendment undercuts any argument that it is content-based. Def.'s Opp'n 12. However, like the Ninth Circuit in *Reed*, the State skips the crucial first step of the analysis—the determination of whether the law is content-neutral on its face. *Reed* makes clear that "an innocuous justification cannot transform a facially content-based law into one that is content neutral." *Reed*, 135 S. Ct. at 2228. The legislature's justification for enacting the MCRA is irrelevant because the Noise Provision is content-based on its face. Accordingly, under *Reed*, there is no need to address the legislature's motives in enacting the law. The Noise Provision must survive strict scrutiny in order to be upheld as constitutional.

### 2.    Whether the Noise Provision Survives Strict Scrutiny

Given that the Noise Provision is content-based, it is presumed to be unconstitutional. *R.A.V.,* 505 U.S. at 382. "While courts theoretically will uphold such a regulation if it is absolutely necessary to serve a compelling state interest and is narrowly tailored to the achievement of that end, such regulations rarely survive strict scrutiny." *McGuire I*, 260 F.3d at 43 (citations omitted). Under strict scrutiny's

demanding standard, the law "must be the least restrictive means of achieving a compelling state interest." *McCullen*, 134 S. Ct. at 2530. "If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative." *Playboy Entm't Grp., Inc.*, 529 U.S. at 813. And "[t]he existence of adequate content-neutral alternatives . . . undercut[s] significantly any defense of such a statute." *R.A.V.,* 505 U.S. at 395 (citations and internal quotation marks omitted). It is the government's burden to show that the law is constitutional. *Playboy Entm't Grp., Inc.*, 529 U.S. at 816.

This case implicates a number of important interests. It is well-established that the State has a legitimate interest in protecting the health and safety of its citizens, which is a "traditional exercise of the [State's] police powers." *Hill*, 530 U.S. at 715 (citation and internal quotation marks omitted). As is stated in the summary of L.D. 1216, there is a history in this country of violence, sometimes extreme, that arises from the tensions inherent in the abortion debate. L.D. 1216 at 14 (117th Legis. 1995). The State has a legitimate interest in deescalating these situations so that they do not lead to violence. Moreover, the State has "a substantial interest in protecting its citizens from unwelcome noise." *City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 806 (1984). And the Supreme Court has also recognized an individual's "right to avoid unwelcome speech" when such speech "is so intrusive that the unwilling audience cannot avoid it." *Hill*, 530 U.S. at 716-17; *see also Frisby v. Schultz*, 487 U.S. 474, 487 (1988) ("The First Amendment permits the government to prohibit offensive speech as intrusive when the 'captive' audience

cannot avoid the objectionable speech."). These interests become particularly significant around hospitals and medical facilities " 'where human ailments are treated, where patients and relatives alike often are under emotional strain and worry, where pleasing and comforting patients are principal facets of the day's activity, and where the patient and his family . . . need a restful, uncluttered, relaxing, and helpful atmosphere.' " *Madsen v. Women's Health Ctr., Inc*., 512 U.S. 753, 772 (1994) (quoting *NLRB v. Baptist Hospital, Inc*., 442 U.S. 773, 783 n.12 (1979)). Thus, even "[t]he First Amendment does not demand that patients at a medical facility undertake Herculean efforts to escape the cacophony of political protests." *Id*. at 772-73. Accordingly, protecting the captive audience inside hospitals and medical facilities from unwelcome noise that threatens their health and well-being is paramount. The State has established that it likely has compelling interests at stake.

However, "even the most legitimate goal may not be advanced in a constitutionally impermissible manner." *Carey v. Brown*, 447 U.S. 455, 465-66 (1980). Here, the Noise Provision will not likely survive strict scrutiny because adequate content-neutral alternatives could achieve the State's asserted interest.[11] *See R.A.V.*,

---

[11]    The State has proffered two limiting interpretations of the Noise Provision. The first is that "a person would not be acting with the requisite intent" to interfere with health services "if there were no possibility that he would interfere with the safe and effective delivery" of those health services. State's Suppl. Br. 2 (ECF No. 67). The import of this interpretation is that "a person would not be in violation of [the Noise Provision] if . . . he protested outside of a closed health facility or outside of a building where health services are not provided." State's Suppl. Br. 2. The second interpretation concerns the longevity of an official warning under the Noise Provision. According to the State, it interprets the warning provision as requiring that "the noise that forms the basis for an MCRA action must be the same or substantially the same noise that was the subject of the warning." State Suppl. Br. 3. Although I have read the Noise Provision "in light of the limits set forth in" the State's

505 U.S. at 396 (content-based ordinance not necessary because "[a]n ordinance not limited to the favored topics . . . would have precisely the same beneficial effect"). Current authority suggests that the State could enact a law prohibiting all "loud, raucous, or unreasonably disturbing noise" outside of facilities providing medical care. *See Pine v. City of W. Palm Beach*, 762 F.3d 1262, 1273 (11th Cir. 2014). Or, the State might prohibit all noise made within a certain proximity to such facilities that has the effect of disrupting the safe and effective delivery of health care. *See, e.g., Grayned v. City of Rockford*, 408 U.S. 104, 119 (1972) (upholding anti-noise ordinance that "punishes only conduct which disrupts or is about to disrupt normal school activities"). In addition, the State (or the City) could limit all noise outside of buildings offering health services if the noise exceeds a certain decibel level. *See, e.g.,* City of Portland Ordinance § 4-57 (prohibiting noise over a certain decibel level for facilities licensed by the state to sell liquor). Given the available content-neutral alternatives, I conclude that it is likely that the Noise Provision is not necessary to serve the State's asserted interest.

The State argues that the intent element of the Noise Provision narrows the reach of the law and targets only the noise that is the problem.[12] It cites *Burson v.*

---

construction of the law, *Cutting* v. *City of Portland*, 802 F.3d 79, 84 (1st Cir. 2015), this does not change my conclusion that the Noise Provision is unlikely to survive strict scrutiny.

[12]    It is not clear to me that the Plaintiff's loud protesting is the only noise that it problematic. The Healey Affidavit suggests that other noise at least has the potential to be disruptive. Healey Aff. ¶¶ 29-30. The video marked as Plaintiff's Exhibit B illustrates this point. *See* Ex. B to Pl.'s Reply (ECF No. 43-6). In it, a woman loudly and profanely assails the pro-life protestors. The pro-choice woman shouts, "What are you doing with your child." She is addressing the comment to the pro-life protestor who has his child with him, and she objects to him exposing the child to the signs with pictures of aborted fetuses. A patient in the examination room would be unlikely to realize that the loud pro-choice protestor is addressing the pro-life protester and not the patient. The pro-choice protestor, who

*Freeman*, 504 U.S. 191, 207 (1992) (plurality opinion), for the proposition that there is "no evidence" that any other noise is a problem and that "[t]he First Amendment does not require States to regulate for problems that do not exist."[13] State Supp. Br. 10 (ECF No. 67). It does seem "counterintuitive to argue that a law violates the First Amendment by abridging *too little* speech." *Williams-Yulee*, 135 S. Ct. at 1668. But "underinclusiveness can raise 'doubts about whether the government is in fact pursuing the interest it invokes.' " *Id.* (quoting *Brown v. Entm't Merch. Ass'n.*, 564 U.S. 786, 802 (2011)).

Finally, the Plaintiff claims that other laws found in the Maine criminal statutes could adequately serve the State's interests of keeping order on the sidewalk.[14]  Pl.'s Mot. for Prelim. Inj. 14. Although it is the State's burden to demonstrate that the Noise Provision can survive strict scrutiny, the State has not offered any explanation as to why these alternative laws are inadequate.[15]

---

lacks the intent to disrupt medical services inside the building, would not be in violation of the Noise Provision. But the pro-life protestor's loud preaching would likely be a violation.

[13]    Further, beyond the fact that the State's evidence seems to suggest that other noise at least has the potential to be disruptive, *see* Healey Aff. ¶¶ 29-30, this portion of the plurality opinion in *Burson* is not consistent with the strict scrutiny inquiry. As Justice Stevens points out in dissent, this "no evidence" justification "contradicts a core premise of strict scrutiny—namely, that the heavy burden of justification is *on the State*." *Burson v. Freeman*, 504 U.S. 191, 226 (1992) (Stevens, J., dissenting) (plurality opinion). Requiring the challenger to present evidence of a problem takes the burden away from the State to justify its restriction on speech.

[14]    A person violates Maine's disorderly conduct statute if, "[i]n a public place, the person intentionally or recklessly causes annoyance to others by intentionally [m]aking loud and unreasonable noises." 17-A M.R.S.A. § 501-A(1)(A)(1). Moreover, a person violates Maine's harassment statute if, without reasonable cause, they "engage[] in any course of conduct with the intent to harass, torment, or threaten another person" after having been warned "not to engage in such conduct." *Id.* § 506-A(1)(A).

[15]    I offer no opinion as to whether these laws "would pass constitutional muster." *McCullen*, 134 S. Ct. at 2538 n.8.

Accordingly, I conclude that the State has not shown at this stage of the proceeding that the Noise Provision is necessary to serve its interest in protecting its citizens' ability to receive safe and effective health care. Because it is likely that the Noise Provision is content-based and will not survive strict scrutiny, I find that the Plaintiff has demonstrated a likelihood of success on the merits of his claim.

## III.   Remaining Injunctive Relief Factors

"In the First Amendment context, the likelihood of success on the merits is the linchpin of the preliminary injunction analysis." *Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 10 (1st Cir. 2012) And "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion). Thus, "irreparable injury is presumed upon a determination that the movants are likely to prevail on their First Amendment claim." *Fortuño*, 699 F.3d at 11; *see also Asociación de Educación Privada de P.R., Inc. v. García-Padilla*, 490 F.3d 1, 21 (1st Cir. 2007).

Given my conclusion that the Plaintiff is likely to succeed on the merits of his First Amendment claim, there is a presumption of irreparable harm. In arguing that the Plaintiff is not likely to suffer irreparable harm absent an injunction, the State points out that the Plaintiff continues to express his views in opposition to abortion outside of the Health Center. Def.'s Opp'n 23. But the fact that the Plaintiff has continued to preach outside the Health Center can cut the other way as well, as it makes the threat to the Plaintiff's First Amendment rights more imminent by making it more likely that he will be cited for violating a content-based restriction on speech.

32

Moreover, the Plaintiff has attested that his encounters with the police have caused him to speak more quietly, and that this makes it more difficult for him to convey his message over the noise from Congress Street. The Plaintiff fears that the State will bring a civil action against him because of the content of his constitutionally protected speech, while other speakers on the public sidewalk are free to voice opposing views at a louder volume. The harm is not so much that his message will be "driven out" as it is that it may be "drowned out" of the marketplace of ideas. The Plaintiff has met his burden of establishing that he will suffer irreparable harm absent injunctive relief.

Turning to "the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues," *Esso Standard Oil Co. (P.R.) v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir. 2006) (citation omitted), I conclude that this factor supports the granting of a preliminary injunction.  The hardship to the Defendants if enjoined from enforcing  a law that is likely unconstitutional will be minimal. On the other side of the scale, continued enforcement of a content-based restriction on speech would result in irreparable harm to the Plaintiff.

 Finally, whether an injunction serves the public interest is a close question. Protecting constitutional rights and the free flow of ideas in traditional public fora plainly serves the public interest. *See McCullen*, 134 S. Ct. at 2529 (citation and quotation marks omitted) ("[T]he guiding First Amendment principle that the government has no power to restrict expression because of its message, its ideas, its

subject matter, or its content applies with full force in a traditional public forum."). But it is also unquestionably in the public interest to allow women to receive medical treatment in a safe and peaceful environment. If I were balancing a woman's right to receive safe and effective medical treatment against the Plaintiff's right to speak at his chosen volume outside the windows of the Health Center, I would conclude that the former is considerably more important than the latter. However, I must also consider the realities of the situation. *See Bl(a)ck Tea Soc'y v. City of Boston*, 378 F.3d 8, 15 (1st Cir. 2004). The Defendants can further their interests of maintaining order and protecting individual patients through the criminal code, most obviously the disorderly conduct and harassment statutes. And the Defendants are free to pass content-neutral legislation that can achieve the goal of a peaceful environment for people receiving health care. While I understand the Defendants' frustration with the shifting sands of First Amendment jurisprudence, avenues are still open to protect the interests on both sides of this debate. Given that there are alternatives available to the State and the City, I conclude that the Plaintiff has met his burden of showing that granting an injunction to prevent continued enforcement of a content-based law would serve the public interest.

## CONCLUSION

For the reasons stated above, the Plaintiff's motion for a preliminary injunction (ECF No. 4) is **GRANTED.** The Defendants are hereby **PRELIMINARY**

**ENJOINED** from enforcing the Noise Provision, 5 M.R.S.A. § 4684-B(2)(D). The remaining portions of the MCRA may be enforced.[16]

SO ORDERED.

/s/ Nancy Torresen
United States Chief District Judge

Dated this 23rd day of May, 2016.

---

[16]     I find that 5 M.R.S.A. § 4684-B(2)(D) is severable from the remainder of the MCRA. *See Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684 (1987) ("Unless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law.*"); Gilbert v. State*, 505 A.2d 1326, 1329 (Me. 1986) (citation and quotation marks omitted) ("[W]here an unconstitutional and invalid portion of a statute is separable from and independent of a part which is valid the former may be rejected and the latter may stand."). The remainder of the MCRA can still be given effect without the Noise Provision.