UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | |
|---|---|
| ANDREW MARCH,<br><br>       Plaintiff,<br><br>vs.<br><br>AARON FREY and CITY OF PORTLAND,<br><br>       Defendants | Civil No. 15-515-NT |

**DEFENDANT CITY OF PORTLAND'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, WITH INCORPORATED MEMORANDUM OF LAW**

Plaintiff Andrew March has not demonstrated that the warnings issued to him by members of Defendant City of Portland's Police Department violated his constitutional rights or that they were pursuant to a City policy. Even if the guidance offered by the City's police chief could be considered a City policy or custom, there is no record evidence that the guidance was a moving force behind any violation of Mr. March's constitutional rights. For these reasons – and for the reasons discussed in the City's Motion for Summary Judgment[1] (ECF No. 163) – the Court should deny Mr. March's request for summary judgment and grant summary judgment to the City.

**BACKGROUND**

    **I.**    **Facts**

Mr. March's claims arise out of three discussions that occurred between him and Portland Police Department officers in November and December of 2015. Moreover, the claims all arise out of alleged enforcement of a specific noise provision of the Maine Civil Rights Act, 5

---

[1] The City hereby incorporates by reference the legal arguments it presented in support of its Motion for Summary Judgment. Fed. R. Civ. P. 10(c). As those arguments demonstrate, Mr. March's claims are meritless. Therefore, the Court should deny his request for summary judgment and grant summary judgment to the City.

M.R.S. § 4684-B(2)(D) (hereinafter referred to as "the Noise Provision"). The factual background for the City's opposition to Mr. March's Motion for Summary Judgment is set forth in the City's response to Mr. March's Statement of Facts and the City's Statement of Additional Facts, which in turn incorporates the Statement of Material Facts filed in support of the City's request for summary judgment (ECF No. 164). Both documents are hereby incorporated by reference. Fed. R. Civ. P. 10(c).

Mr. March makes certain assumptions in his Motion for Summary Judgment that are not supported by the record. For example, Mr. March refers to February 18, 2013 and July 28, 2015 letters authored by Chief of Police Michael Sauschuck as "policies" promulgated by the Portland Police Department. (ECF No. 165, at 5 and 6). He cites no competent evidence to support those assertions. The documents are letters advising anyone who receives them of the City's efforts to address protests occurring on Congress Street in front of Planned Parenthood "to ensure that pedestrians and workers enjoy safe and unimpeded access to this building, while respecting the first amendment rights of all citizens." (ECF No. 148-19 at 820-22 and 825-827 (City Defendants' Response to Plaintiff's Request for Production, Exh. 1)). The letters also refer to the City's efforts to ensure adherence to state and local laws related to disorderly behaviors and sidewalk obstruction. *Id*. With reference to noise complaints, the letters draw the reader's attention to the provisions of Section 4684-B of the Maine Civil Rights Act. *Id*. As the documents themselves provide information concerning the City's efforts to ensure compliance with state and local law – including, in pertinent part, one particular state law pertaining to noise complaints affecting buildings where health services are provided – Mr. March's assumptions are unsupported.

Similarly, Mr. March alludes to a list of expectations and duties from Commander Gary Rogers to officers working the "Planned Parenthood Detail" on January 6, 2016 as a "policy,"

without any evidence to suggest that Commander Rogers did or could set policy for the City.[2] Moreover, Commander Rogers' instructions draw directly from the Noise Provision: "If you are notified by PPH staff that someone is so loud they are interfering with the safe and effective delivery of health services you will need to warn the person who is too loud and explain to them what they are being warned for as well as the consequences for continuing." (ECF No. 148-22 at 855 (¶ 4) (Defendant City of Portland's Amended Response to Plaintiff's First Set of Interrogatories, Exh. A)).

## II. Procedural Posture

By a Complaint filed on December 21, 2015, Mr. March commenced this action against the City, Maine's then Attorney General Janet Mills, and Portland police officers William Preis, Jason Nadeau, Graham Hults, and Donald Krier. The current operative pleading is the First Amended Complaint, which was filed on February 3, 2016. Mr. March asserts claims against the City in five counts: 1) free speech – viewpoint discrimination (First Cause of Action); 2) free speech – time, place, manner (Second Cause of Action); 3) free speech – prior restraint (Third Cause of Action); 4) equal protection – Fourteenth Amendment (Fourth Cause of Action); and 5) due process – vagueness (Fifth Cause of Action). All of the counts seek relief pursuant to 42 U.S.C. § 1983 for alleged violations of the First and Fourteenth Amendments to the United States Constitution. The City filed an Answer denying the material allegations of the First Amended Complaint and asserting numerous affirmative defenses. By an order dated February 7, 2019, Aaron Frey, Maine's current Attorney General, was substituted for Ms. Mills as a party defendant. By a stipulation filed on May 24, 2019, Mr. March dismissed with prejudice his claims against the individual officers – Mr. Preis, Mr. Nadeau, Mr. Hults, and Mr. Krier.

---

[2] As discussed more fully below, Commander Rogers' email and attached instructions were sent after the events alleged in the First Amended Complaint. Therefore, those documents could not have caused any constitutional violations alleged in that pleading. *See infra* at 8.

Therefore, the only claims remaining in this case are those asserted against the City and Mr. Frey.

## ARGUMENT

The crux of Mr. March's argument on summary judgment appears to be contained in one paragraph of his memorandum of law – specifically, the second full paragraph on page 10. In that paragraph, Mr. March seems to suggest that the City's "policies" with regard to the Noise Provision constitute "misinterpretations" of that statute. In particular, Mr. March appears to argue that: one, the City's "policy" allows an officer to issue a warning without personally confirming that someone is making noise that can be heard inside a health care facility, which (he suggests) is contrary to the Noise Provision; and two, that the City's officers will issue a warning without any indication that the noise is interfering with the safe and effective delivery of health services. For a variety of reasons, these arguments are meritless.

### I. THE CITY'S ENFORCEMENT OF THE NOISE PROVISION – A STATE LAW – DOES NOT IMPLICATE A CUSTOM OR POLICY OF THE CITY.

Governmental entity liability under 42 U.S.C. § 1983 can be assessed only "where the municipality *itself* causes the constitutional violation at issue. *Respondeat superior* or vicarious liability will not attach under § 1983." *City of Canton, Ohio v. Harris,* 489 U.S. 378, 385 (1989). The United States Supreme Court has required a plaintiff to demonstrate that a policy or custom of the governmental entity led to the constitutional deprivation alleged. *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 694 (1978). The plaintiff must show both the existence of a policy or custom and a causal link between that policy and the constitutional harm. *See, e.g., City of Canton,* 489 U.S. at 387-90; *Oklahoma City v. Tuttle,* 471 U.S. 808, 823 (1985).

Mr. March's complaints in this case center on the enforcement of the Noise Provision. As the First Circuit has held, the Noise Provision is a facially valid restriction on noise made outside of buildings in which health care services are being provided. *March v. Mills*, 867 F.3d 46, 69

(1st Cir. 2017). The Noise Provision is, of course, a state law enacted by the Maine Legislature. Based on persuasive decisions from other circuit courts of appeal, when City officers issue warnings expressly contemplated by that state statute, they are not carrying out a City custom or policy. Therefore, the City cannot be held liable under Section 1983 for warnings issued pursuant to the Noise Provision.

The First Circuit has not yet decided whether enforcement of state law by municipalities can give rise to municipal liability under Section 1983. However, in a relatively recent decision, the United States Court of Appeals for the Seventh Circuit held that a local registration board was not liable under Section 1983 for its role in implementing state law because the board was carrying out a policy judgment made by the state: "Whether one views their role as merely implementing the statutory directive, or as carrying out the removal of those identified as statutorily appropriate by the local sheriff, the local voter registration boards simply do not make an independent policy judgment." *Snyder v. King*, 745 F.3d 242, 249-50 (7th Cir. 2014). In reaching this conclusion, the Seventh Circuit discussed the relationship between the standard for municipal liability under Section 1983 and the enforcement of state law by a municipality:

> In answering that question [regarding the extent to which that municipal entity was independently responsible for the allegedly unconstitutional act], courts have focused on whether "there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989); *Leahy v. Bd. of Trs.*, 912 F.2d 917, 922 (7th Cir. 1990) ("Proximate causation between the municipality's policy or custom and the plaintiff's injury must be present.") (quoting *Strauss v. City of Chicago,* 760 F.2d 765, 767 (7th Cir. 1985)). *To say that any such direct causal link exists when the only local government "policy" at issue is general compliance with the dictates of state law is a bridge too far; under those circumstances, the state law is the proximate cause of the plaintiff's injury. See Surplus Store and Exchange, Inc. v. City of Delphi,* 928 F.2d 788, 791-92 (7th Cir. 1991)); *Whitesel v. Sengenberger,* 222 F.3d 861, 872 (10th Cir. 2000) (county cannot be liable for "merely implementing" a policy created at the state level); *Familias Unidas v. Briscoe,* 619 F.2d 391, 404 (5th Cir. 1980) (municipal entity cannot be held liable for simply enforcing state law because the municipal policy in that instance "may more fairly be characterized as the

> effectuation of the policy of the State … embodied in that statute, for which the citizens of a particular county should not bear singular responsibility.").

Id. at 247 (emphasis added).

Mr. March's claims in this case all arise out of actions taken by City police officers that are expressly contemplated by the Noise Provision. A warning from a law enforcement officer is required in order to establish a violation of the provision. Moreover, the Noise Provision clearly contemplates a complaint from someone receiving or providing health care services that noise outside a building is interfering with the provision of those services as a trigger for a warning from law enforcement. No one other than those persons would have standing to make such an assertion. Finally the Notice Provision does not suggest that a law enforcement officer is free to ignore a complaint that noise outside a building is interfering with the provision of health care services. For the Noise Provision to work as intended, a law enforcement officer is required to provide a warning to a person making the noise. Therefore, the actions of City officers in this case were pursuant to a policy determination by the State of Maine and not pursuant to such a determination by the City.[3] The City cannot be held liable under Section 1983 for its involvement in carrying out state law.

## II.     THE CITY'S APPROACH TO HANDLING COMPLAINTS UNDER THE NOISE PROVISION WAS NOT DELIBERATELY INDIFFERENT, NOR WAS IT THE MOVING FORCE BEHIND ANY CONSTITUTIONAL VIOLATIONS.

Even if the Court were to consider the guidance provided by the former Chief of Police, Michael Sauschuck, as a City policy,[4] the approach the City took to dealing with complaints that

---

[3] The First Circuit noted that "[t]he Noise Provision was the product of a careful legislative process … [that] sought to forge a consensus among many competing interests in order to address what all parties to this dispute agree is a serious concern regarding the health and safety of those seeking health services." *March*, 867 F.3d at 69. It also held that "the Noise Provision targets the subset of noise that Maine has identified as being especially problematic." *Id.* at 66. Therefore, the First Circuit has clearly acknowledged that the Noise Provision is a policy determination made by the State of Maine – and not the City – to address a particular situation.

[4] Mr. March appears to characterize the emails from Glen McGary and Commander Rogers as City policies. However, he has not established – factually or legally – that either Mr. McGary or Commander Rogers are "final policymakers" for the purposes of Section 1983. *See Jett v. Dallas Indep. Sch. Dist.*, 491

implicated the Notice Provision was not deliberately indifferent to Mr. March's constitutional rights, nor was it the moving force behind any alleged constitutional violations. The record reflects that the City advised its officers of some general guidelines to follow in responding to complaints of noise that was interfering with the provision of health care services. The guidance to the officers was based on the terms of the statute itself and suggested steps the officers could take to further confirm the complaints. As reflected in these materials – and as confirmed by Mr. Sauschuck – the City's approach was dependent upon a complaint from a patient or a health care provider (in conjunction with a patient). Moreover, the City's guidance emphasized that the focus of a warning under the Noise Provision was the volume of the noise and not the content.

This approach by the City did not constitute deliberate indifference as a matter of law. First, the City's guidance – based on the statute itself, which was entitled to a presumption of validity (and which was subsequently determined by the United States Court of Appeals for the First Circuit to be valid) – expressly limited the officers to issuing warnings as to the level of noise, after having spoken to a patient or health care providers concerning the interference the noise was causing. Therefore, the guidance did not implicate a grave risk of harm.[5] Second, in complying with the Noise Provision, the City had no actual or constructive knowledge that its officers' actions implicated a grave risk of harm. Finally, by providing its officers guidance that emphasized the need for a complaint that noise was interfering with the provision of health care services and that limited warnings to the volume of the noise, the City took the only measures it could to ensure that First Amendment rights were respected.

---

U.S. 701, 737-38 (1989). Absent such a demonstration, their actions cannot result in liability to the City. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 121-23 (1988). However, out of an abundance of caution, the City will also address Mr. March's arguments as they pertain to Mr. McGary's and Commander Rogers' emails.

[5] Indeed, since the First Circuit has determined that the Noise Provision is constitutional on its face, it would seem obvious that guidance that tracks the terms of the provision could not generate a grave risk of a constitutional violation.

Mr. March's suggestion that Mr. Sauschuck's letters and the instructions issued to the Planned Parenthood detail by Glen McGary and Commander Rogers "misinterpreted" the Noise Provision are patently erroneous. Mr. Sauschuck's letters do not comment on the substance of the Noise Provision or attempt to interpret its terms – they simply reference the statute and provide a copy of its text. Similarly, Mr. McGary's email does not attempt to interpret any aspect of the Noise Provision.

Mr. March's reference to Commander Rogers' email is erroneous for two reasons. First, Commander Rogers' email (and the attached instructions) could not have caused the constitutional violations alleged by Mr. March because it was sent to the shift log on January 6, 2016 – a month after the last event alleged by Mr. March in his First Amended Complaint (allegedly occurring on December 11, 2015). (ECF No. 30 at 188-89, ¶¶ 84-93 (First Amended Complaint). In fact, the email was sent about two weeks after Mr. March's original Complaint was filed. (ECF No. 1 (filed on December 21, 2015)). Therefore, nothing set forth in that email could have been the moving force behind the alleged violations. Second, the email (and the attached instructions) specifically tracks the language of the Noise Provision:

> If you are notified by PPH staff that someone is so loud they are interfering with the safe and effective delivery of health services you will need to warn the person who is too loud and explain to them what they are being warned for as well as the consequences for continuing.

(ECF No. 148-22 at 855 (¶ 4).

Moreover, all of the documents identified by Mr. March emphasize the respect that should be accorded First Amendment rights. In that regard, Mr. Sauschuck stated in his letters:

> "This letter addresses the ongoing protests taking place in front of 443 Congress Street. The goal of the Portland Police Department is to ensure that pedestrians and workers enjoy safe and unimpeded access to this building, *while respecting the first amendment rights of all citizens.*"

(ECF. No. 148-19 at 820 and 825 (emphasis added)). Mr. McGary's email counsels as follows:

> "The detail officer will maintain a high level of visibility, be proactive in preventing potential confrontations, address any violations of state statutes (i.e., obstructing a public way, assault, etc.), *and be mindful of 1st Amendment rights of the protesters*."

(ECF No. 148-19 at 823 (emphasis added)). Commander Rogers, in his email, conveys a similar sentiment:

> "Your primary role is to be highly visible at the entrance to PPH. You are there to keep the peace, make sure that the sidewalk and entrance to the building are accessible to all, *and to make sure that any protesters present are afforded their freedom of speech*."

(ECF No. 148-22 at 855 (emphasis added)).

Mr. March is simply incorrect when he suggests that the City's "policies" have misinterpreted the Noise Provision. To the extent the documents identified by Mr. March state that the officers may rely on reports by Planned Parenthood employees that noise outside was interfering with the provision of health services, such a comment is not inconsistent with the Noise Provision – which does not impose any requirement that the officer who issues a warning must personally hear the noise. To the extent Mr. March suggests that the documents urge City officers to issue warnings any time noise is reported (without reference to the impact that noise is having on the provision of health services), he is mischaracterizing the documents. Neither of Mr. Sauschuck's letters suggest such an approach, nor does Mr. McGary's email. And Commander Rogers' parenthetical remark about the report from PPH staff of loud noise being "good enough" follows directly after the language quoted above concerning the effect the loud noise is having on the provision of health services. Finally, Mr. March mischaracterizes and takes out of context the comment in Commander Rogers' email concerning "a notion," suggesting that the comment does not require any inquiry into the nature of the interference with health services. After discussing the circumstances that would prompt a warning (which is quoted above), the email discussed how to document continued loud noise notwithstanding the warning:

> At a minimum, we should obtain a detailed statement from the clinic staff person which indicates the series of events and the notion that the protestor has interfered with the safe and effective delivery of health services within the building. The officer's report should also confirm that the protestor was previously ordered to cease the noise (date and time), and after such warning, the protestor intentionally continued to make noise that could be heard within the building with the intent to interfere with the delivery of health services.

(ECF No. 148-22 at 855 (¶ 6)). In all respects, the guidance offered by the City to its officers tracks the language of the facially constitutional statute.

In any event, the City's approach to dealing with noise complaints under the Noise Provision was not the cause of any constitutional violations. Under the City's approach, the content of the noise that was being made was irrelevant. Moreover, the City's approach did not preclude persons from speaking – it simply resulted in warnings to lower the volume of the noise after complaints were received. Therefore, the City's approach did not – and could not – have caused a violation of Mr. March's First Amendment rights or his equal protection rights. Finally, as discussed in more detail below, the Noise Provision – which was the basis for the guidance provided by the City – had sufficient standards to preclude a due process violation, even if those standards were not as distinct a "bright line" as Mr. March would have preferred. For all of these reasons, the City cannot be held liable for Mr. March's claims.

### III. THE RECORD EVIDENCE DOES NOT ESTABLISH THAT THE PLAINTIFF'S CONSTITUTIONAL RIGHTS WERE VIOLATED BY THE ACTIONS OF THE CITY'S OFFICERS.

As noted above, a municipality cannot be held liable based on *respondeat superior* for the actions of its individual employees. However, it also cannot be held liable *unless* there was an underlying constitutional violation by its employees. *See Kennedy v. Town of Billerica*, 617 F.3d 520, 531 (1st Cir. 2010). The record in this case does not reflect that any of the City's officers violated Mr. March's constitutional rights. Therefore, it is the City – and not Mr. March – who is entitled to summary judgment.

### A. There is no record evidence to establish that the City's officers considered the content of the speech when they spoke with the Plaintiff.

As the First Circuit has held, the Noise Provision is a facially valid restriction on noise made outside of buildings in which health care services are being provided. *March*, 867 F.3d at 69. The Noise Provision expressly contemplates that a law enforcement officer issue a warning to a person who is making noise that interferes with "the safe and effective delivery of those services within the building" *before* a determination can be made that the person is violating the Noise Provision: "It is a violation of this section for any person … *[a]fter having been ordered by a law enforcement officer to cease such noise*, [to] intentionally mak[e] noise that can be heard within a building…." Moreover, the determination as whether noise being made outside a building is interfering with the provision of such health care services necessarily requires the assessment of a patient or a health care professional (in conjunction with a patient, obviously).

In this context, the actions of the City's police officers in responding to noise complaints from Planned Parenthood patients or staff against Mr. March did not constitute viewpoint discrimination. In each of the three events referenced in the First Amended Complaint, the City's police officers were responding to complaints by patients or health care professionals within the Planned Parenthood facility. In other words, until the City's officers received a complaint from Planned Parenthood's patients or health care professionals that the level of noise outside their building was interfering with the provision of health care services, the officers did not take any action. Since the officers were not involved in the provision of health care services, they necessarily could not have initiated a discussion with Mr. March without a complaint. Finally, the officers did not issue warnings to other people on the sidewalk or to persons parading down Congress Street (protesting climate change, for example) for the simple reason that they did not receive any complaints that the noise those people were making was

interfering with the provision of health care services. Therefore, the officers' discussions with Mr. March did not constitute viewpoint discrimination.

Similarly, none of the officers ever told Mr. March that they were issuing a warning to him because of the content of his speech. Mr. Nadeau asked Mr. March to lower the volume of his voice so that it would not be heard inside the second floor of the adjacent building. Mr. Hults made a similar request to Mr. March. Mr. Krier gave Mr. March a warning regarding the volume of his voice. In doing so, Mr. Krier made specific reference to the Noise Provision and he handed Mr. March a copy of the statute containing the Noise Provision. Finally, Mr. Preis did not warn Mr. March or make any requests of him – he simply engaged in a discussion with Mr. March about the Noise Provision. Not one of these officers issued warnings to Mr. March because of the content of his speech and not one of these officers told Mr. March that he had to stop speaking. In short, the actions of the City's officers were not prompted or motivated by the substance of Mr. March's statements.

> **B. There is no record evidence to establish that the City's officers' comments to the Plaintiff almost completely foreclosed his ability to communicate his message or constituted impermissible prior restraint on his speech.**

For the reasons described above, the actions of the City's police officers did not constitute an impermissible restraint on Mr. March's speech – they constituted warnings pertaining to the level of noise he was making that were expressly contemplated by a facially-valid noise statute. The First Circuit has noted that governmental regulations "governing in advance the time, place or manner of expression permitted in a particular public forum are valid if they serve important state interests by the least restrictive means possible." *Fantasy Book Shop, Inc. v. City of Boston*, 652 F.2d 1115, 1120 (1st Cir. 1981) (citing *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 209 (1975); *Cox v. Louisiana*, 379 U.S. 536, 554 (1965)). The First Circuit has restated this standard as follows: "[A] regulation that is directed primarily at conduct

or at non-communicative aspects of protected expressive activities is permissible despite an incidental prior burden on expression if it is justified by sufficiently strong permissible government interests." *Id.* (citing *Konigsberg v. State Bar of California*, 366 U.S. 36, 50-51 (1961)). In the present case, the First Circuit has already held that the Noise Provision is "a facially content-neutral measure that targets noise for reasons that have nothing to do with the content of any topic discussed, idea propounded, or message conveyed. Moreover, by its terms, the measure serves that significant state interest without burdening substantially more speech than necessary and while leaving open ample alternative avenues for communication." *March*, 867 F.3d at 69. Therefore, the warnings issued by the City's police officers – which addressed the volume of the noise Mr. March was making – are constitutionally permissible.

Notably, Mr. March's interactions with the City's officers did not cause him to refrain from speaking in front of the Planned Parenthood building. Mr. March readily concedes that the City's police officers did not tell him to stop speaking. Moreover, although Mr. March now suggests that he no longer speaks in front of the Planned Parenthood building because he fears enforcement of the Noise Provision, Mr. March also concedes that he continued to speak in that location in the weeks that followed the discussions with the officers. In fact, the Court has been provided a video of Mr. March speaking for an extended period of time in front of the Planned Parenthood building on January 8, 2016. As the Court can observe, Mr. March can and did communicate at a volume that could be easily heard and understood by persons on the sidewalk and on Congress Street. Mr. March does not suggest that he received a warning about the volume of his voice on January 8, 2016.

Lastly, it is significant to note that none of the officers made a determination that Mr. March had violated the Noise Provision. On the occasions referenced in the complaint, there were no repeated complaints of noise after a warning had been issued; therefore, there were no actions to be assessed "*[a]fter having been ordered by a law enforcement officer to cease such

*noise.*" It is undisputed that Mr. March was never arrested by the City's police officers, nor was he ever the subject of enforcement proceedings by the State of Maine. Moreover, as reflected by videos of the interactions between Mr. March and the officers, none of the officers threatened Mr. March with arrest.[6] In short, the only actions taken by the City's officers – the issuance of warnings in response to noise complaints from Planned Parenthood officials or patients – did not involve the content of Mr. March's speech. The officers did not – and could not – violate Mr. March's First Amendment rights by issuing warnings expressly contemplated by a facially valid noise statute. Therefore, Mr. March's claims based on the alleged impact on his ability to speak fail as a matter of law.

### C. The record evidence does not reflect that the Plaintiff's equal protection rights were violated by the City's officers.

Mr. March does not appear to develop any argument as to his equal protection claim. Therefore, he has not provided the Court with any cogent basis for summary judgment. Conversely, the City has demonstrated (through its own Motion for Summary Judgment) that the record in this case does not support any equal protection claims. Consequently, it is the City – and not Mr. March – which is entitled to summary judgment on that claim.

A plaintiff asserting a claim for an equal protection violation based on selective enforcement of law or regulation must show that "'(1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'" *Freeman v. Town of*

---

[6] Although Mr. March appears to suggest that Mr. Hults threatened Mr. March with arrest, the video of that discussion does not support that assertion. (ECF No. 148-5 (Video of interaction between Mr. March and Mr. Hults on December 11, 2015)). Mr. March's suggestion to the contrary should be disregarded as it is contradicted by a contemporaneous video of the event. *See Hunt v. Massi*, 773 F.3d 361, 364 (1st Cir. 2014) ("'we need not accept [the plaintiff's] version of events if it is blatantly contradicted by the evidence.'") (quoting *Penn v. Escorsio*, 764 F.3d 102, 105 n.2 (1st Cir. 2014) (quoting *Medina-Rivera v. MVM, Inc.*, 713 F.3d 132, 136 (1st Cir. 2013)) (internal quotation marks omitted)); *see also Scott v.*

*Hudson*, 714 F.3d 29, 38 (1st Cir. 2013) (quoting *Rubinovitz v. Rogato*, 60 F.3d 906, 909-10 (1st Cir. 1995)).

Assuming, for the purposes of argument, that the officers' discussions with Mr. March constituted "enforcement" of the Noise Provision, all of those discussions were prompted by reports from patients or health care professionals that the level of noise Mr. March was making was interfering with the safe and effective delivery of health services. There is no evidence in the record to suggest that the officers ever spoke to Mr. March without first receiving a complaint, nor is there any evidence that Mr. March's religion was a factor in the officer's actions. Finally, there is no record evidence that the officers treated anyone differently than Mr. March – i.e., there is no evidence that they declined to speak to someone whom patients or health care professionals had reported as causing noise that was so loud that it was interfering with health services. It may be true that the City's police officers did not issue any warnings to those involved in the climate change protest or in any parade down Congress Street to reduce their noise levels; however, it is also true that there is no evidence that the City received complaints that noise generated by those gatherings was interfering with the provision of health care services in any building. Therefore, those gatherings were not similarly situated to Mr. March in the context of the Noise Provision. For these reasons, the City's officers did not violate Mr. March's equal protection rights.

### D. The record evidence does not reflect that the Plaintiff's due process rights were violated by the City's officers.

Mr. March does not appear to develop any argument as to his due process claim. Therefore, he has not provided the Court with any cogent basis for summary judgment. Conversely, the City has demonstrated (through its own Motion for Summary Judgment) that

---

*Harris*, 550 U.S. 372, 378-81 (2007) (refusing to adopt the plaintiff's version of facts when it was "clearly contradict[ed]" by the videotape of the events).

the record in this case does not support any due process claims. Consequently, it is the City – and not Mr. March – which is entitled to summary judgment on that claim.

There are two recognized bases under the Due Process Clause of the Fourteenth Amendment to hold a statute impermissibly vague. "First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000) (citing *Chicago* v. *Morales,* 527 U.S. 41, 56-57 (1999)). A statute is not impermissibly vague if it: identifies a particular harm to be addressed; requires causality between that protected interest and certain forbidden conduct; and imposes a scienter requirement. *Grayned v. City of Rockford*, 408 U.S. 104, 113-14 (1972).

The evidence demonstrates that the Noise Provision is not impermissibly vague either on its face or as applied by the officers. As the First Circuit noted, the Noise Provision clearly identifies the harm to be addressed: "a serious concern regarding the health and safety of those seeking health services." *March*, 867 F.3d at 69. It requires a causal connection between the protected interest and certain forbidden conduct: "intentionally making noise that can be heard within a building." Finally, it requires proof of intent to "jeopardize the health of persons receiving health services within the building" or to "interfere with the safe and effective delivery of those services within the building." Therefore, on its face the Noise Provision is not unconstitutionally vague. *See Grayned*, 408 U.S. at 113-14

For similar reasons, the actions taken by the City's officers under the Noise Provision were not impermissibly vague. The officers adhered to the plain terms of the statute when they made their requests that Mr. March lower the volume of his voice so that he would not be heard in the second-floor offices of Planned Parenthood. They further explained the reason they were asking him to lower his volume by referencing the statute and its terms. In fact, in the earliest incident alleged by Mr. March, Mr. Krier provided Mr. March with a copy of the statute itself.

The City's officers also encouraged Mr. March to consult with an attorney or with the Attorney General's office if he had further questions concerning the Noise Provision.

Mr. March's complaints that the officers were unable to provide him with a specific lack of decibel level are unavailing. First, the Noise Provision does not specify a particular decibel level for noise that is prohibited; therefore, the officers could not provide him with that information. Second, other courts have noted that such a specific noise measurement is not constitutionally required. *See Abrami v. Town of Amherst*, 2013 U.S. Dist. LEXIS 99068, *42 (D. Mass. July 16, 2013); *see also United States v. Agront*, 773 F.3d 192, 198 (9th Cir. 2014) ("The regulation need not identify a specific decibel level for the level of noise that would qualify for a penalty; the normal operation of VA facilities provides an adequate measure for determining what constitutes prohibited conduct."). Third, the statute adequately defines the level of noise that is prohibited – "noise that can be heard within a building" and with a specific disruptive effect – such that a specific decibel level is not necessary. *See also March*, 867 F.3d at 67 (responding to Plaintiff's assertion that the statute is objectionable because it does not contain a decibel level by noting that "[t]o be subject to the Noise Provision, however, a 'lone, unamplified voice[]' must still be loud enough to be heard within a building and must speak with the requisite disruptive intent"). Therefore, the absence of a specific decibel level does not render the Noise Provision – or its "enforcement" – impermissibly vague.

## CONCLUSION

For the reasons set forth in this Opposition and incorporated memorandum of law, it is the City of Portland – and not Mr. March – that is entitled to summary judgment on all claims in this matter. The Court should deny Mr. March's Motion and grant the City summary judgment.

Dated at Portland, Maine this 22nd day of July, 2019.

                Attorneys for Defendant City of Portland
                MONAGHAN LEAHY, LLP
                95 Exchange Street, P.O. Box 7046
                Portland, ME 04112-7046
                (207) 774-3906
BY:   /s/ John J. Wall, III
                John J. Wall, III

## CERTIFICATE OF SERVICE

I hereby certify that on July 22, 2019, I electronically filed **Defendant City of Portland's Opposition to Plaintiff's Motion for Summary Judgment, with Incorporated Memorandum of Law** using the CM/ECF system, which will provide notice to me and the following other counsel of record: mail@whitinglawfirm.com; bbolling@thomasmore.org; and Christopher.C.Taub@maine.gov.

Dated at Portland, Maine this 22nd day of July, 2019.

                Attorneys for Defendant City of Portland
                MONAGHAN LEAHY, LLP
                95 Exchange Street, P.O. Box 7046
                Portland, ME 04112-7046
                (207) 774-3906
BY:   /s/ John J. Wall, III
                John J. Wall, III