## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| ANDREW MARCH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Docket No. 2:15-cv-515-NT |
| | ) | |
| AARON M. FREY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

Plaintiff Andrew March is a protester who opposes abortion. He alleges that a provision of the Maine Civil Rights Act has been applied unconstitutionally against him, in violation of his First and Fourteenth Amendment rights. Before me are motions for summary judgment pursuant to Federal Rule of Civil Procedure 56 from Defendant Aaron Frey (the "**Attorney General**") (ECF No. 162) and Defendant City of Portland ("**Portland**" or "**the City**") (ECF No. 163), and a motion for partial summary judgment from Mr. March against the City (ECF No. 165). For the reasons set out below, the Attorney General's motion and the City's motion are **GRANTED**, and Mr. March's motion is **DENIED**.

# BACKGROUND

## I.    Factual Background[1]

### A.    Increasing Noise Complaints and the Portland Police Department Response

Planned Parenthood operates a facility at 443 Congress Street in Portland,

Maine (the "**Health Center**"), where it provides counseling and health care services,

---

[1]    Because I ultimately conclude that the Defendants prevail on their motions and the Plaintiff does not prevail on his, the following background is drawn from the undisputed facts set out in the parties' statements of facts, the disputed facts reasonably resolved in the Plaintiff's favor, and the exhibits contained in the Joint Stipulated Record. I rely heavily on the numerous videotapes of Mr. March's encounters with the police rather than the parties' characterization of those tapes. *See Mitchell v. Miller*, 56 F. Supp. 3d 57, 58 n.1 (D. Me. 2014) (citing *Scott v. Harris*, 550 U.S. 372, 380–81 (2007)) (inferences that can *reasonably* be drawn in a non-moving party's favor can be limited by existence of video evidence).

For the universe of facts, see Plaintiff's Statement of Material Facts in Response to Defendant Attorney General Aaron M. Frey's Motion for Summary Judgment (ECF No. 170) (containing all facts in support of Attorney General's motion for summary judgment and Plaintiff's responses thereto) ("**AG's Mot. Facts**"); Plaintiff's Statement of Material Facts in Response to Defendant City of Portland's Statement of Material Facts in Support of its Motion for Summary Judgment (ECF No. 172) (containing all facts in support of City's motion for summary judgment and Plaintiff's responses thereto) ("**City's Mot. Facts**"); Defendant City of Portland's Response to Plaintiff's Statement of Material Facts and Defendant City of Portland's Statement of Additional Facts and Plaintiff's Statement of Additional Material Facts in Reply to Defendant City of Portland's Opposing Statement of Material Facts (ECF Nos. 175 and 179) (containing all facts in support of Plaintiff's motion for summary judgment, additional facts provided by City, and all responses thereto) (collectively "**Pl.'s Mot. Facts**"); and the Joint Stipulated Record (ECF No. 168) ("**JSR**").

In accordance with Local Rule 56, all properly supported statements of fact to which there is not a properly supported denial or qualification are deemed admitted. D. Me. Loc. R. 56(b)–(f). In many instances, the Plaintiff has attempted to qualify the Defendants' facts by repeating "Plaintiff does not have any evidence to dispute the assertion contained in paragraph [x]; however, Plaintiff has never been provided any evidence to corroborate this assertion and was not able to locate any such evidence on his own." *See, e.g.*, City's Mot. Facts ¶¶ 8–10, 17, 30, 31, 42, 44, 45, 48; *see also* AG's Mot. Facts ¶¶ 8–13, 15, 19, 20. These qualifications are ineffective. If the Plaintiff does not have evidence to dispute a properly supported fact, then that fact is deemed admitted. *See Mullen v. New Balance Athletics, Inc.*, No. 1:17-cv-194-NT, 2019 WL 958370, at *1 n.1 (D. Me. Feb. 27, 2019) (plaintiff's supported facts are deemed admitted where defendant attempted to qualify facts by asserting that it had "no knowledge" of the fact asserted).

Similarly, the Plaintiff repeats in many instances that he "is unable to answer paragraph [x] pursuant to Local Rule 56(c) because it is not a statement of fact." *See, e.g.*, City's Mot. Facts ¶¶ 7, 11–14, 16, 20, 35, 39, 43, 46, 47, 49, 52. In each of these instances, the Defendant has set out a discrete fact. Because the Plaintiff's "cut and paste" response does not point to any dispute in the record or contain any cogent argument, this factual assertion, and the other factual assertions to which Plaintiff responded similarly, are deemed admitted.

Finally, the City asserted seventy-two facts to support its motion for summary judgment, and it asserted those identical seventy-two facts as additional facts in response to the Plaintiff's motion. That would ordinarily not be a problem, but the Plaintiff's responses differed for twenty-three of the

including abortions. Pl.'s Mot. Facts ¶¶ 12–13. The Health Center is located on the second floor, and its windows overlook the sidewalk below. City's Mot. Facts ¶¶ 41–42; JSR Exs. 1, 6.[2] Congress Street is a busy street with lots of traffic and noise. Pl.'s Mot. Facts ¶ 62. Monument Square, a public area that sometimes hosts events with amplified noise, is located nearby, and the portion of Congress Street where the Health Center is located sometimes sees parades and protests. Pl.'s Mot Facts ¶¶ 63–66.

The Portland Police Department began receiving increased complaints around February of 2013 about noise created by protesters outside of the Health Center. Pl.'s Mot. Facts ¶ 14. On February 18, 2013, Portland Police Department Chief Michael Sauschuck wrote a letter to his officers on the topic of sidewalk protests in front of the Health Center, and he called their attention "to the Maine Civil Rights Act prohibition against creating noise that can be heard within the building where health

---

seventy-two facts. For example, the Plaintiff admitted City's Motion Facts ¶¶ 4, 6, 18, 19, 21, 22, 24, 32–34, 36–38, and 41, but when those identical facts were asserted as additional facts in response to the Plaintiff's motion, the Plaintiff either offered a qualification or claimed that the assertion was not a fact. *See* Pl.'s Mot. Facts ¶¶ 74, 76, 88, 89, 91, 92, 94, 102–04, 106–08, and 111. Similarly, where the Plaintiff stated that ¶¶ 7, 11, 14, 16, 43, 49, and 52 were not statements of fact in his response to the City's Motion Facts, he qualified those identical facts in Plaintiff Motion Facts ¶¶ 77, 81, 84, 86, 113, 119, and 122. Lastly, although the Plaintiff qualified ¶ 30 and denied ¶ 67 of the facts submitted in support of the City's motion, he admitted those same facts when they were submitted as additional facts in response to his motion. *See* Pl.'s Mot. Facts ¶¶ 100, 137. While I am required to resolve facts that the parties dispute in favor of the non-moving party, there is no such parallel rule when the Plaintiff has contradicted himself. Thus, whenever the Plaintiff has somewhere admitted a fact asserted by the City, I accept it as undisputed.

[2]       Exhibit 1 of the Joint Stipulated Record is a video of an individual (not the Plaintiff) who is preaching up toward the windows of the Health Center. In it, the protester comments that he knows that they can hear him and that he has seen them draw the curtain. Exhibit 6 of the Joint Stipulated Record is a video of an exchange between Lt. Preis of the Portland Police Department and Mr. March. The angle from which the video is taken shows the Health Center building in the background, and the second-floor windows are visible. The videotapes show that the windows of the Health Center are directly above the protesters.

services are being provided." Pl.'s Mot. Facts ¶ 16.[3] Attached to the letter was a document containing synopses of "[p]ossible criminal offenses," including the state's disorderly conduct, harassment, and obstructing public ways laws, and "[p]ossible civil offenses," including the state's civil disorderly conduct provision and the Maine Civil Rights Act. JSR Ex. 19 at 4–6 (ECF No. 148-19). On July 28, 2015, an updated version of Chief Sauschuck's February 2013 letter and statute summary was recirculated by Richard Bianculli, the Portland Police Department's Neighborhood Prosecutor. JSR Ex. 19 at 8–9.[4]

---

[3]     The body of the letter states in full:

This letter addresses the ongoing protests taking place in front of 443 Congress Street. The goal of the Portland Police Department is to ensure that pedestrians and workers enjoy safe and unimpeded access to this building, while respecting the first amendment rights of all citizens.

As you know, the Portland Police have been present at most of the protests, and have consistently ensured adherence to state and local laws related to disorderly behaviors and sidewalk obstruction. Please see the attached synopsis of those laws and regulations.

In recent weeks we have received an increase in complaints regarding the noise created by the protesters. Accordingly, I wish to draw your attention to the Maine Civil Rights Act prohibition against creating noise that can be heard within the building where health services are being provided (see page 2 of the attached list). Please understand that any future violations of this law will be referred to the Attorney General's office for prosecution.

If you have any questions or would like to meet to discuss these issues, please feel free to contact Trish McAllister, the Police Department's Neighborhood Prosecutor, at 756-****.

JSR Ex. 19 at 4–6 (ECF No. 148-19).

[4]     The recirculated letter by Chief Sauschuck was dated July 28, 2015, and contained the contact information for Mr. Bianculli, but it was otherwise identical to Chief Sauschuck's February 2013 letter. In his cover email, Mr. Bianculli states:

Please note that it is a violation of the Maine Civil Rights Act (http://legislature.maine.gov/statutes/5/title5sec4684-B.html) for protestors to protest loudly to the point where their voices can be heard within the counseling rooms for Planned Parenthood. If you are responding to this type of situation, a citation can be

The Maine Civil Rights Act ("**MCRA**") was enacted in 1989. In broad strokes, it authorizes suit by the Attorney General or any aggrieved person against any person who, "whether or not acting under color of law, intentionally interferes or attempts to intentionally interfere . . . with the exercise or enjoyment by any other person" of rights secured by the United States or Maine Constitutions or federal or state laws. 5 M.R.S.A. §§ 4681–4682. In 1995, the Legislature enacted an amendment that made it a violation of the MCRA to interfere or attempt to interfere with a person's civil rights by: (1) physically obstructing the entrance or exit of a building; (2) making repeated telephone calls to disrupt activities in a building; (3) setting off any device that releases "noxious and offensive odors" within a building; or (4) making noise that can be heard within a building, after having been ordered by law enforcement to stop, with the intent to interfere with the delivery of health services inside. 5 M.R.S.A. § 4684-B(2). Specifically, the MCRA's noise provision prohibits an individual from,

> [a]fter having been ordered by a law enforcement officer to cease such noise, intentionally making noise that can be heard within a building and with the further intent either:
> (1) To jeopardize the health of persons receiving health services within the building; or
> (2) To interfere with the safe and effective delivery of those services within the building.

5 M.R.S.A. § 4684-B(2)(D) (the "**Noise Provision**").

---

issued if the individual refuses to follow your directive after a verbal warning. Please feel free to contact me directly if you ever have any questions in regard to this issue.

JSR Ex. 19 at 8.

At times pertinent to this action, Planned Parenthood paid the City to have Portland police officers work an overtime detail in front of the Health Center during times when protesters were present. Pl.'s Mot. Facts ¶ 26; JSR Ex. 19 at 7. On July 9, 2014, Lt. Glen McGary of the Portland Police Department sent an email to the "PPD Shift Log" regarding the expectations for officers participating in the "Planned Parenthood Detail." Pl.'s Mot. Facts ¶ 21.[5]

---

[5] The body of the email states:

PLANNED PARENTHOOD DETAIL

The outside detail at Planned Parenthood is at 443 Congress St., the detail runs on Friday's [sic] from 0800-1200.

— If you take the job please check with staff at the start of the job and before securing as the job may go longer as dictated by the protesters.

— The officer will be in the entry way [sic] of 443 Congress St.

— The detail officer will maintain a high level of visibility, be proactive in preventing potential confrontations, address any violations of state statutes (i.e. obstructing a public way, assault, etc.), and be mindful of 1st Amendment rights of the protesters. Protesters cannot block the doorways to the adjacent businesses.

— Take a cruiser, park it in front of the entrance (or as close as possible), make sure the camera is recording and pointed at the entrance to 443 Congress St., make sure you have the microphone with you and activate it when protesters are present.

— The officer needs to keep a count of the number of protestors at 0800, 0900, 1100, and 1200 (please email the numbers to Sgt. Hutchings in groupwise). Also if there is any sort of confrontation/disturbance please note that and put it in the email.

— If there are any complaints from protesters, workers or patrons, the detail officer will request a Supervisor and the Shift Commander will be notified as well. Neighborhood Prosecutor Trish McAllister will be available if there is a legal question.

— The beat officers should also give SA to the area on Friday's [sic].

— At the beginning of shift, an A-Team officer will put out an EMERGENCY NO PARKING sign, , [sic] on the spot where the cruiser will park to video the entrance.

On occasions, protesters will be present on Saturday morning. The beat officer at that time will take hourly head counts and report this Information to Sgt. Hutchings via email.

### B.     The Plaintiff's Protest Activities and the Portland Police Department's Interactions with Him

Mr. March believes he has been called by God to actively oppose abortion. AG's Mot. Facts ¶ 1 (ECF No. 170). He regularly voiced his opposition to abortion outside of the Health Center by preaching, praying, spreading pro-life messages, and communicating or attempting to communicate with women to dissuade them from receiving abortion services. Pl.'s Mot. Facts ¶ 120. The record reflects that Health Center staff complained to the Portland Police Department about Mr. March on four occasions: November 6, 2015, November 13, 2015, December 4, 2015, and December 11, 2015. The present litigation stems from the three separate interactions between Mr. March and Portland police officers occurring on November 6, 2015, December 4, 2015, and December 11, 2015. Pl.'s Mot. Facts ¶ 71.

### 1.     The November 6, 2015 Encounter

On November 6, 2015, Mr. March was on the sidewalk in front of the Health Center. Pl.'s Mot. Facts ¶ 72. Portland Police Officer Jason Nadeau received a report from dispatch of a complaint from someone at the Health Center that there was a person outside making noise at a volume that was interfering with the provision of medical services. City's Mot. Facts ¶¶ 5–6. When Officer Nadeau arrived at the Health Center, there was a male speaking loudly enough that Officer Nadeau could

---

Doran Lovell is an onsite employee and her contact number is 797-****ext. *.

Thank You

JSR Ex. 19 at 7.

7

hear him from a distance of about a half city block to a full city block. Pl.'s Mot. Facts ¶ 79.

Officer Nadeau approached the male, later identified as Mr. March, and much of the encounter was captured on video. JSR Exs. 3 and 4.[6] The encounter can best be described as a conversation between Officer Nadeau and Mr. March. The tone was civil on both sides. Officer Nadeau spoke softly, and others in the area occasionally chimed in. Mr. March spoke in a considerably louder voice than anyone else on the recording, but he was not shouting. JSR Ex. 3.

The substance of the conversation can be summed up as follows.[7] Officer Nadeau informed Mr. March that officers had received a complaint that someone could be heard within the building. Officer Nadeau suggested that Mr. March was the individual who could be heard. Mr. March demurred. Officer Nadeau informed Mr. March that he (Nadeau) heard him when he rolled up from "back there." Mr. March asked whether there was a noise ordinance. Officer Nadeau informed him that there was. Mr. March asked Officer Nadeau to give him an objective volume that he could speak at. Officer Nadeau asked Mr. March if he could bring hi] voice down so that they could not hear him inside. Mr. March asked how he (March) would know whether they could hear him from inside, and Officer Nadeau stated, "You can bring

---

[6]     Exhibits 3 and 4 are recordings of the same interaction taken from different angles.

[7]     A transcript is attached as Appendix A to this opinion. I have created this transcript and the others contained in the appendices by transcribing the videotapes in the record. They are rough transcripts intended to add clarity to the factual record for this Order. Throughout this Order, quotations from the encounters between Mr. March and City police officers are drawn from these rough transcripts and from the videotapes themselves.

it down from where you're at right now or go from there." Mr. March continued to ask for an objective standard. Officer Nadeau then said:

> Listen, I'm here for a noise complaint. . . . They say that they can hear you. . . . I'm not trying to give you a hard time. I'm not trying to move you guys out of here. I know you guys have to be here. . . . But when they call in a complaint, I have to come talk to you.

Mr. March responded, "[G]ive me a way to continue to speak my convictions while honoring what you're saying." Officer Nadeau said, "Just bring your voice down a little. Can you do that?" Mr. March agreed to bring his voice down a little. But he questioned whether the people inside the building could lie and say that they could hear him even if he was just whispering, and Officer Nadeau acknowledged that they could. Officer Nadeau ended the conversation shortly thereafter. JSR Exs. 3 and 4.

Shortly after this encounter, a discussion occurred between Officer Nadeau, Sergeant Chuck Libby, and Major Donald Krier of the Portland Police Department, and Major Krier determined that a warning under the Noise Provision of the MCRA was appropriate. City's Mot. Facts ¶¶ 15–16. Major Krier delivered the warning, which was partially captured on video. JSR Ex. 7. The encounter was civil. The substance of the conversation was as follows.[8] Mr. March told Major Krier that Officer Nadeau had not previously warned him and had only asked him for a favor. Mr. March asked whether he was being officially warned by Major Krier. Major Krier responded, "About noise, ya. All's I'm doing is I'm letting you know what it's all about." Major Krier provided Mr. March with a copy of the MCRA. Mr. March asked

---

[8]   A transcript is attached as Appendix B to this opinion.

for further explanation about the MCRA, and Major Krier indicated that the law was self-explanatory and suggested that Mr. March consult a lawyer if he had any questions.[9]

### 2.   The November 13, 2015 Complaint

Portland Police Department records indicate that on November 13, 2015, Lt. William Preis and Officer Argitis responded to complaints from Health Center staff that they could hear protesters on the street below. JSR Ex. 19 at 14–16. The narrative portion of the Police Report states:

> Lt. W. Preis and I Ofc. D. Argitis responded to Planned Parenthood and met with the following Staff: Alexandra Cousins, Meredith Healey, and Nicole Clegg. These people forwarded the complaints to some degree on behalf of non-present staff that they could hear the protestors on the street below. Healey stated that she could identify via voice and sight out the window one of the protestors complained of: a black male named "Andrew March." The parties indicated that while they could hear the protest, none of them indicated how this awareness constituted an interference with their delivery of healthcare services. Rather, they indicated that hearing the 'aggressive' noise and sometimes the content of the speech constituted a distraction and may have troubled unidentified patients. Lt. Preis and I went to one of the exam rooms where the alleged violation occurred and we could not hear any noise from below. Apparently, the protestors had left the area by this time. Lt.

---

[9]    The Portland Police Department records contain the following summary of the response to the Complaint from Planned Parenthood on November 6, 2015:

PROTESTERS ARE AUDIBLE IN THE HEALTH CENTER.

204 – upon arrival i was only able to hear one of the protestors, and his voice was above normal talking. i spoke to this male about the complaint and asked him to quiet down, and he did lower his voice. I did advise him that the complaint was that he could be heard from inside. I asked this male for his name and he refused to identify himself. Major Krier did arrive and provided this male with a copy of the Maine civil rights act which served as his officail [sic] warning. I did speak to amy inside planned parenthood and advised her of the police contact with the male. she was able to tell me that this male's first name was andrew. andrew is a black male with average height and build about 40 years old.

JSR Ex. 19 at 13.

> Preis provided Clegg information on the process of the complaints alleged should they occur again. I also consulted with the police neighborhood prosecutor on this matter. Lastly, I informed Clegg that this matter would be documented in police records via this narrative.

JSR Ex. 19 at 14–16.

### 3.    The December 4, 2015 Encounter

On December 4, 2015, Officer Graham Hults, after speaking with someone from the Health Center, told Mr. March that he was being too loud. City's Mot. Facts ¶¶ 23–24. Mr. March asked Officer Hults for a specific volume level, and Officer Hults responded that he could not give Mr. March a specific level. City's Mot. Facts ¶ 25. At Mr. March's request, Officer Hults asked a supervisor to come to the scene. City's Mot. Facts ¶ 26. Lt. Preis responded to the Health Center and met with Mr. March. City's Mot. Facts ¶ 29; Pl.'s Mot. Facts ¶ 100.

Lt. Preis had a cordial conversation with Mr. March, some of which was captured on videotape. JSR Ex. 6. The substance of the conversation was as follows.[10] Lt. Preis greeted Mr. March and asked if he had a question about the MCRA. Mr. March explained that he wanted to know how loud he should speak so that he could exercise his constitutional rights. Mr. March told Lt. Preis that a climate change protest that had recently passed through had made more noise than he was making. Lt. Preis told Mr. March that he (Preis) did not think he was being too loud, and Mr. March indicated that he had not changed his volume at all.  Lt. Preis then told Mr. March:

---

[10]    A transcript is attached as Appendix C to this opinion.

> [T]he Maine Civil Rights Act does talk about if they can articulate that noise and specifically the type of speech and what's being said is interfering with a medical procedure, that's where the problem could be and that's very gray. . . . I understand what you're saying that you hear other noise that's louder and that may be. It's not based on a decibel level.

Mr. March responded: "So what you just said was the content of what I am saying is really the problem." Lt. Preis answered: "It's a combination." Lt. Preis recommended to Mr. March that he reach out to the Attorney General's office to try and work something out. Mr. March told Lt. Preis that he intended to keep speaking, and Lt. Preis responded, "Alright. I understand." Lt. Preis did not issue a warning to Mr. March. Pl.'s Mot. Facts ¶ 109.

### 4.    The December 11, 2015 Encounter

On December 11, 2015, Portland Police Officer Graham Hults received a complaint from someone at the Health Center that Mr. March was making noise at a volume that was interfering with the provision of medical services on the second floor of the Health Center building. Pl.'s Mot. Facts ¶¶ 110–11. Officer Hults went inside to the second floor of the Health Center and could hear Mr. March. Pl.'s Mot. Facts ¶ 112.

Officer Hults had a conversation with Mr. March that was videotaped. JSR Ex. 5. Again, Mr. March was the loudest of any of the speakers on the video, and those on the sidewalk around him could easily hear him. JSR Ex. 5. The substance of the encounter was as follows.[11] Officer Hults indicated to Mr. March, "You're being heard

---

[11]    A transcript is attached as Appendix D to this opinion.

upstairs so they want you to quiet down a little." Mr. March complained that his civil rights were being infringed. Officer Hults stated repeatedly that he was only concerned with Mr. March's volume. Mr. March accused Officer Hults of violating his civil rights, and Officer Hults repeatedly stated that he was just asking Mr. March to quiet down.

Although Mr. March was louder than in the previous encounters, when Mr. March asked, "Is there a definitive volume level that I can speak at?", Officer Hults replied, "Right now is fine." Toward the end of the encounter, Officer Hults explained that it was only a problem when Mr. March's voice was so loud that it could be heard from inside the building. Officer Hults clarified, "When I go upstairs, I can hear you. That's when it's a problem. . . . People who have to move back because they're having an exam right in this other room, and they don't feel comfortable because they can hear you." When Mr. March complained that Health Center staff "can constantly come down here no matter what my tone is, right?", Officer Hults responded, "If I go up there and I can't hear anything, I can say 'you know what, I don't see a problem right here.' " JSR Ex. 5.

### 5.    Since the December 11, 2015 Encounter

On January 6, 2016, Commander Gary Rogers emailed Planned Parenthood OT Detail Instructions to officers assigned to the Planned Parenthood detail. The Instruction sheet provides:

> This is a list of the expectations and duties that are part of the Over Time Detail at 443 Congress St., Planned Parenthood.
>
> 1. Always take a cruiser that has working audio and visual recording capability.

13

2. Park the cruiser in such a manner that the front entrance to 443 Congress St. is visible on the camera. Have the camera recording audio and visual for the entire time of the detail (the obvious exceptions would be to turn off the audio for conversations not related to the detail ie. phone calls)

3. Your primary role is to be highly visible at the entrance to PPH. You are there to keep the peace, make sure that the sidewalk and entrance to the building are accessible to all, and to make sure that any protestors present are afforded their right to freedom of speech.

4. If you are notified by PPH staff that someone is so loud they are interfering with the safe and effective delivery of health services you will need to warn the person who is too loud and explain to them what they are being warned for as well as the consequences for continuing. (you do not need to be the one to hear if it is too loud inside, if they say it is too loud that is good enough.) Notify the in-town patrol sergeant of the complaint.

5. Once you have warned the person about being too loud you need to document it in the CAD screen or have dispatch enter it. (You need to enter the name of the person you warned and that you explained what the warning was for as well as that you explained what happens if it continues)

6. If that person continues to be loud and staff from PPH tells you that they can still hear them from inside then notify the in-town patrol sergeant. You will need to do a report and forward it to the AG's office. Best practice for officers is to take detailed reports from all parties involved. While it is not necessary to obtain a detailed statement from the victim (the patient), such a statement would certainly be helpful. The patient's name does not have to be released (Jane Doe) if this is a concern. At a minimum, we should obtain a detailed statement from the clinic staff person which indicates the series of events and the notion that the protestor has interfered with the safe and effective delivery of health services within the building. The officer's report should also confirm that the protestor was previously ordered to cease the noise (date and time), and after such warning, the protestor intentionally continued to make noise that could be heard within the building with the intent to interfere with the delivery of health services.

7. If you have any questions or issues please call for a Supervisor to respond ASAP

8. At the end of the detail please forward the number of protestors and if any counter protestors, as well as the name, date and time of anyone who was warned for being too loud (or any other issues that came up) to Sgt. Hutchings [email address].

14

9. The point of contact for PPH staff is Meredith Healey [phone number]

JSR Ex. 22-A.

Between December 24, 2015, and April 29, 2016, Mr. March was outside the Health Center protesting on at least twenty occasions. Pl.'s Mot. Facts ¶ 120. A video taken on January 8, 2016, shows Mr. March speaking outside the Health Center. Pl.'s Mot. Facts ¶ 121; JSR Ex. 2. Even with the typical street noise on Congress Street, Mr. March could be clearly heard by those in his vicinity without having to yell or raise his voice to a level that could be heard within the clinic. City's Mot. Facts ¶ 52; JSR Ex. 2. Mr. March has not protested outside of the Health Center since April of 2016, out of fear that his demonstrations will subject him to prosecution. Pl.'s Mot. Facts ¶ 69.

No official or employee of the City of Portland has ever instructed Mr. March to stop speaking based on the content of Mr. March's speech, and no official or employee of the City of Portland has ever ordered or instructed Mr. March to stop speaking. Pl.'s Mot. Facts ¶¶ 137–38. Mr. March received one official warning under the MCRA from Major Krier on November 6, 2015. JSR Ex. 7. Mr. March has never been arrested or summonsed by an officer of the Portland Police Department for violating the MCRA's Noise Provision or for any other reason. Pl.'s Mot. Facts ¶¶ 139–40. Mr. March was never referred to the Attorney General for prosecution. AG's Mot. Facts ¶ 13.

Since 1995, the Attorney General has received only one referral involving a potential violation of the Noise Provision, and it was a referral made by the Portland

Police Department about an individual named Brian Ingalls. AG's Mot. Facts ¶¶ 11–12. Other than the present lawsuit, Mr. March has never had any interactions with the Attorney General's Office, and the Attorney General has never brought a Noise Provision enforcement action or threatened to bring such an action against Mr. March. AG's Mot. Facts ¶¶ 16–17.

## II.    Procedural History

Mr. March filed suit and moved for a preliminary injunction in December of 2015. Compl. (ECF No. 1); Mot. for Prelim. Inj. (ECF No. 4). He later filed an Amended Complaint asserting that the Noise Provision of the MCRA, both facially and as applied to him, violated his First Amendment rights and his Fourteenth Amendment rights to equal protection and due process. First Am. Compl. ("**Am. Compl.**") (ECF No. 30). I granted the Plaintiff's motion for a preliminary injunction because I found that on its face the Noise Provision likely violated the First Amendment. Order (ECF No. 71). The Attorney General appealed my decision, and the First Circuit reversed, concluding that the Noise Provision was facially constitutional and requiring me to consider Mr. March's as-applied challenges. *March v. Mills*, 867 F.3d 46 (1st Cir. 2017). I stayed the case while the Plaintiff sought Supreme Court review, which was denied. (ECF Nos. 91–94.) Following ample time for discovery, the parties filed the pending motions for summary judgment.[12]

---

[12]    The Plaintiff dismissed his claims against Portland Police Department officers William Preis, Jason Nadeau, Donald Krier, and Graham Hults. *See* Stipulation for Order of Dismissal (ECF No. 159).

## LEGAL STANDARD

Summary judgment is appropriate when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A dispute is genuine where a reasonable jury could resolve the point in favor of either party. *Oahn Nguyen Chung v. StudentCity.com, Inc.*, 854 F.3d 97, 101 (1st Cir. 2017). A fact is material where it could influence the outcome of the litigation. *Id.* On a motion for summary judgment, courts must construe the record in the light most favorable to the non-movant and resolve all reasonable inferences in the non-movant's favor. *Burns v. Johnson*, 829 F.3d 1, 8 (1st Cir. 2016). Nevertheless, a court must "disregard 'conclusory allegations, improbable inferences, and unsupported speculation' in determining whether a genuine factual dispute exists." *Cherkaoui v. City of Quincy*, 877 F.3d 14, 24 (1st Cir. 2017) (quoting *Sullivan v. City of Springfield*, 561 F.3d 7, 14 (1st Cir. 2009)). In addition, the nonmovant "must provide sufficiently supported evidence, without relying upon mere allegation or denials of the movant's pleading, to establish a genuine issue for trial." *Id.* (internal quotations and alteration omitted).

When faced with cross-motions for summary judgment, a court must "decide each motion . . . on its own merits." *Wells Real Estate Inv. Trust II, Inc. v. Chardon/Hato Rey P'ship, S.E.*, 615 F.3d 45, 51 (1st Cir. 2010). This means "determin[ing] whether either of the parties deserves judgment as a matter of law on facts that are not disputed." *Adria Int'l Grp., Inc. v. Ferré Dev., Inc.*, 241 F.3d 103, 107 (1st Cir. 2001). But each motion should not be considered in a vacuum. *Wells Real Estate*, 615 F.3d at 51. Rather, a district court ordinarily should consider the motions

17

"at the same time, applying the same standards to each motion." *Id.* (internal quotations omitted); *see also Cochran v. Quest Software, Inc.*, 328 F.3d 1, 6 (1st Cir. 2003) (explaining that the summary judgment standard is "not altered by the presence of cross-motions for summary judgment" because the court considers distinctly each motion and draws inferences against each movant in turn).

## DISCUSSION

The Plaintiff brings his claims against the City and the Attorney General under 42 U.S.C. § 1983. Section 1983 provides a cause of action against state officials who deprive, or cause another to deprive, an individual of rights protected by federal law. "To prevail, a plaintiff must show that 'the challenged conduct is attributable to a person acting under color of state law' and that 'the conduct must have worked a denial of rights secured by the Constitution or by federal law.' " *Freeman v. Town of Hudson*, 714 F.3d 29, 37 (1st Cir. 2013) (alternation omitted) (quoting *Soto v. Flores*, 103 F.3d 1056, 1061 (1st Cir. 1997)).

To establish § 1983 liability against a municipality, a plaintiff must satisfy "two basic elements: first, that plaintiff's harm was caused by a constitutional violation, and second, that the [municipality was] responsible for that violation." *Young v. City of Providence*, 404 F.3d 4, 25–26 (1st Cir. 2005). In showing that the municipality was responsible, a plaintiff may not rely on *respondeat superior* to establish municipal liability for the actions of city employees. *Monell v. Dep't. of Soc. Servs.*, 436 U.S. 658, 694 (1978). Rather, a plaintiff must show that "[t]he alleged

municipal action at issue . . . constitute[s] a 'policy or custom' attributable to the City." *Young*, 404 F.3d at 26 (citations omitted).

In order for the Plaintiff to establish that either the Attorney General or the City is liable, he must establish a harm caused by a constitutional violation.[13] I begin my analysis here. The Plaintiff contends that the Defendants have violated three of his constitutional rights: his right to free speech, his right to equal protection of the laws, and his right to due process. The Plaintiff's first problem is that the record does not support his claims of any such constitutional violations. His second problem is that, even if he could show that his constitutional rights were violated, the Plaintiff would have to show that the City and the Attorney General caused those rights to be violated. I conclude that he has failed to do so.

## I.    Violation of Constitutional Rights

### A.    First Amendment Right to Free Speech

The Plaintiff contends that the Noise Provision, as applied to him, violates his First Amendment right to free speech because it has been enforced based on the content of his message and because it acts as an unconstitutional prior restraint on his speech.

---

[13]    The issue of whether there has been a constitutional violation is distinct from the issue of whether a plaintiff has standing. Although Mr. March has not been fined under the Noise Provision, he has been warned under the statute and claims that his speech has been chilled. This seems sufficient to establish his standing to bring his constitutional claims. Where he falls short is in identifying facts showing that the City acted unconstitutionally in bringing about his alleged injury. *See McGuire v. Reilly*, 386 F.3d 45, 59, 65 (1st Cir. 2004) (holding that protester had standing despite lack of prosecution but ultimately concluding that his as-applied challenge failed because he produced "no evidence that the police . . . enforced [the] statute in anything other than an evenhanded way").

### 1.    Viewpoint and Content Discrimination

Count I of the Amended Complaint asserts that the City has discriminated against the Plaintiff based on his viewpoint and the content of his speech, thereby violating his First Amendment rights. Am. Compl. ¶¶ 116–17; Pl.'s Mot. 10–11. I start with the Complaint's viewpoint discrimination claim.[14] "The essence of a viewpoint discrimination claim is that the government has preferred the message of one speaker over another." *McGuire v. Reilly*, 386 F.3d 45, 62 (1st Cir. 2004).

The First Circuit has already concluded that the Noise Provision here is facially constitutional. Accordingly, Mr. March must proceed on a theory that the Noise Provision was unconstitutionally applied to him.[15] *McGuire*, 386 F.3d at 48 (after First Circuit rejected facial challenge to statute that prohibited people from approaching, without permission, anyone within a zone around abortion clinics, plaintiffs were left to pursue as-applied challenge that officers discriminated based

---

[14]    Mr. March's briefing was frustratingly vague. For instance, he does not address viewpoint discrimination anywhere in his motion or in his responses to the City or Attorney General's motions. He does not offer any analysis of whether there is a distinction between viewpoint-based and content-based discrimination. He shifts between legal authorities and factual claims without offering any analysis of how a particular legal doctrine applies to the facts of his case.

[15]    After *McGuire* was decided, Massachusetts amended its buffer-zone statute, replacing the six-foot no-approach zones with a 35-foot fixed buffer zone from which individuals were categorically excluded unless an exemption applied, such as the exemption for clinic employees acting within the scope of their employment. The Supreme Court struck down this version as facially unconstitutional. *See McCullen v. Coakley*, 573 U.S. 464 (2014). The Court held that, though the statute was content and viewpoint neutral, it was not narrowly tailored to serve a significant government interest. The Court also noted that the plaintiffs in *McCullen* "nowhere allege[d] selective enforcement" of the statute. *Id.* at 484. Nevertheless, in dicta, the Court reasoned that, if clinic escorts were authorized to speak about abortion within the buffer zone while non-escorts were not, the statute's "exemption for clinic employees would then facilitate speech on only one side of the abortion debate—a clear form of viewpoint discrimination that would support an as-applied challenge to the buffer zone at that clinic." *Id.* at 485. But the Court then noted that the record "contain[ed] insufficient evidence to show that the exemption operate[d] in this way at any of the clinics." *Id.*

on viewpoint when enforcing the statute). The *McGuire* court explained that, in order to prevail on the as-applied challenge for "viewpoint discriminatory enforcement," a plaintiff would need to proceed on a theory of selective enforcement and "would need to show 'a pattern of unlawful favoritism.' "[16] *Id.* at 64 (quoting *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 325 (2002)).

Here, however, Mr. March marshals no facts to show a pattern of unlawful favoritism.[17] *Id.* at 65 (concluding that plaintiffs were "stymied because there [was] no evidence that the police turned a blind eye toward pro-abortion speech while not turning a blind eye to possible transgressions by plaintiffs"). The facts here show that the only complaints that the police received were complaints from the Health Center about Mr. March. And, the police never acted unless they received a complaint. The fact that the police took no action in response to a climate change protest does not establish a pattern of unlawful favoritism because there is no evidence that the police ever received a complaint about the climate protest interfering with the provision of

---

[16]     The buffer zone statute at issue in *McGuire* was held facially constitutional, despite the "fact that one side of the abortion debate might suffer some incidental adverse effects or burdens," because the legislature's motivations in passing the statute were content neutral. 386 F.3d at 63. The First Circuit then reasoned that "some showing of intent on the part of government officials" was likely required for an as-applied viewpoint discrimination claim too. *Id.* "Unless government actors were to intentionally enforce the statute unequally, then any evidence of inequality that plaintiffs were to show would merely indicate a 'disproportionate burden' that would not signify viewpoint discrimination." *Id.* (alterations omitted) (quoting *McGuire v. Reilly*, 260 F.3d 36, at 44 (1st Cir. 2001)). Because the court found that the plaintiffs had failed to establish a pattern of unlawful favoritism, the court sidestepped the question of whether the level of intent required for a viewpoint discrimination claim under the First Amendment differed from the intent requirement for an equal protection claim under the Fourteenth Amendment. *Id.*

[17]     The *McGuire* court also noted that a viewpoint discrimination claim can arise "when the state decides whether or not to impose criminal penalties based on the viewpoint expressed by someone's words." *McGuire*, 386 F.3d at 62. Mr. March develops no argument that the Defendants have criminalized his viewpoint—nor could he, as the facts show that officers repeatedly told him he could keep sharing his message.

health care services.[18] Nor does it give any indication that officers were favoring certain opinions on a topic over others. *See id.* at 62 (explaining that a viewpoint discrimination claim can exist when the "government enforces the law against persons of one viewpoint who violate the statute while not enforcing the law against similarly situated persons of the opposing viewpoint who also violate the statute").

Turning to content discrimination, when the First Circuit upheld the facial constitutionality of the Noise Provision at issue here, it suggested that there could be a successful as-applied challenge if the Noise Provision's "disruptive-intent requirement were enforced in an entirely content-dependent way."[19] *March*, 867 F.3d at 61, 64 (concluding, however, that a health center's complaint that a person's noise is interfering with the provision of health services is not a content-based restriction). But even here Mr. March fails to present a cogent argument or offer facts establishing or even suggesting that the statute was "enforced in an entirely content-dependent

---

[18]    Although the Plaintiff repeatedly suggests that Health Center staff only complained about pro-life protestors and speculates that Health Center staff could lie about whether they could hear Mr. March inside the building, he makes no attempt to explain how the Attorney General or the City could be liable for the actions of private parties. "Only the Government can violate First Amendment rights." *McGuire,* 386 F.3d at 60. The Plaintiff has developed no argument that the Noise Provision or the City's policy somehow transformed Health Center staff into government actors subject to the First Amendment.

[19]    Mr. March argues that the Noise Provision "is being used . . . to stifle the speech of pro-life preachers [like March] who are preaching to the public **and who have no intent to disrupt health services**." Pl.'s Am. Opp'n City's Mot. 10 (emphasis in original) (ECF No. 174). I note that neither the City nor the Attorney General has issued a citation to Mr. March under the Noise Provision. Rather, police officers appear to be enforcing the Noise Provision in just the way that the First Circuit envisioned. *See March v. Mills*, 867 F.3d at 61 ("The protester is . . . subject to the Noise Provision's restriction on noisemaking only if he expresses that message in a certain manner—that is, with the specified disruptive intent and 'after having been ordered by a law enforcement officer to cease.' "). The fact that no citation was issued suggests that the warning served its purpose—it screened out the speakers who did not have the intent to disrupt the provision of health services. *See id.* ("[T]he most probative evidence of disruptive intent is a person's decision to intentionally keep making loud noise after having been warned of its disruptive effect.").

way." *See id.* at 61. For example, he provides no facts indicating that the officers singled out Mr. March because of the content of his speech rather than the disruptive nature of it. Instead, he surmises that Health Center staff must have done so, asking, "Why would Planned Parenthood staff—who have admitted to making complaints based upon the content of Plaintiff's speech—not make such complaints when Portland's policies permit them to silence speech they disagree with?"[20] Pl.'s Reply 5 (ECF No. 178).

In reality, the record contains numerous undisputed facts supporting a very different conclusion, namely that officers acted because they received complaints about the disruptive nature of Mr. March's noise; that the Portland Police Department only issued one official warning to Mr. March; and that on the occasion when he was warned, the officer could hear Mr. March's voice from at least a half block away, giving the police independent confirmation of Mr. March's volume. *See* City's Mot. Facts ¶¶ 6, 9; JSR Ex. 3 (showing that on November 6, 2015, Officer Nadeau responded to the Health Center after receiving a complaint that a person outside was speaking at a volume that interfered with the provision of health care

---

[20]     Mr. March provides no citation for his assertion that "Planned Parenthood staff have admitted to making complaints to Portland based upon the content of Plaintiff's speech." Pl.'s Am. Opp'n City's Mot. 9. His factual statements that purport to align with this assertion either contain no citations to the record or unhelpfully cite the entire record. *See* Pl.'s Mot. Facts ¶ 46 (citing no part of record in alleging that officers were informed by Health Center staff "that sometimes the content of the protestors' speech constituted a distraction and may have troubled unidentified patients"); Pl.'s Mot. Facts ¶ 67 (citing entire record to state that Health Center staff have only lodged complaints against pro-life protesters). Pursuant to Local Rule 56(f), I disregard these unsupported assertions. *See* D. Me. Loc. R. 56(f) ("The court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment. The court shall have no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statements of facts.").

services inside the building and that as he rolled up he could hear the Plaintiff from at least a half block away); City's Mot. Facts ¶¶ 31–33 (stating that on December 4, 2015, Mr. March acknowledged that Officer Hults spoke to him after receiving a complaint from someone inside the Health Center); City's Mot. Facts ¶¶ 40–41 (stating that on December 11, 2015, after receiving a complaint from inside Health Center that Mr. March was making noise at a volume that interfered with the provision of health care services, Officer Hults went into the Health Center and verified that Mr. March could be heard from inside).

Moreover, Mr. March's argument that the City's enforcement of the Noise Provision has "armed [Health Center] staff with a heckler's veto" is likewise unsupported. *See* Pl.'s Mot. 11. An unconstitutional "heckler's veto" exists when the government allows or disallows protected speech based merely on the audience's reaction to its content. *See Bachellar v. Maryland*, 397 U.S. 564, 567 (1970) ("[I]t is firmly settled that under our Constitution the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers, or simply because bystanders object to peaceful and orderly demonstrations.") (internal quotations and citations omitted); *Ctr. for Bio-Ethical Reform, Inc. v. L.A. Cty. Sheriff Dep't*, 533 F.3d 780, 788 (9th Cir. 2008) ("[T]he government cannot silence messages simply because they cause discomfort, fear, or even anger.").

Again, the First Circuit has already held that the Noise Provision is facially constitutional and content-neutral, and Mr. March has put forth no evidence that the police acted based merely on the Health Center staff's reaction to the content of his

message. Instead, the properly supported facts establish that the police only acted when Health Center staff complained that Mr. March interfered with the provision of health care services.[21] *See Rosenbaum v. City & Cty. of San Francisco*, 484 F.3d 1142, 1159 (9th Cir. 2007) (rejecting "heckler's veto" claim of viewpoint discrimination and noting that imputing the view of the complainant to investigating officers would lead to an "absurd result").

There is only one statement by an officer that content was ever considered. During the December 4, 2015 encounter, Lt. Preis essentially told Mr. March that it was a combination of the noise that he was making and the content of what he was saying that caused a problem. *See* JSR Ex. 6. But this single reference by a police officer to the content of the message does not help Mr. March. Not only did Lt. Preis not issue a warning under the Noise Provision, but he even told Mr. March, "I don't think you are being very loud, based on what I'm seeing." JSR Ex. 6. Mr. March was allowed to continue his protest. In fact, at that interaction, and at all others in the record, officers repeatedly assured Mr. March that he could continue to share his

---

[21]     Mr. March does not point to facts that support his claim that Health Center employees issued complaints solely based on his message. The record reveals that Mr. March protested many times outside of the Health Center, both before and after the incidents relevant to this case without any complaints from Health Center Staff. When Health Center staff did complain on November 6th, December 4th, and December 11th, the record reveals that they told the police that noise could be heard inside the Health Center. JSR Exs. 3, 5, 6. There is, however, one complaint in which the Health Center staff referred to both noise and content. The police record generated from the Planned Parenthood complaint made on November 13, 2015, states that the staff indicated that "hearing the 'aggressive' noise and sometimes the content of the speech constituted a distraction and may have troubled unidentified patients." JSR Ex. 19 at 15–16. Although this record evidence exists, it does not help the Plaintiff. The police report indicates that the complainants had not "indicated how [the awareness of the protests] constituted an interference with their delivery of health care services." JSR Ex. 19 at 15. There is no indication in the record that the police took any action against Mr. March based on the November 13th complaint.

message at a lower volume. The Plaintiff might have been able to establish a constitutional violation if the police had asked him to bring his volume down to a whisper or required him to stop speaking altogether. But the videotapes show that Mr. March was allowed to continue speaking at a level that was loud and clear enough for his intended audience to easily hear him. *See* JSR Exs. 2, 3, 4, 6, and 7; *see also* Pl.'s Mot. Facts ¶ 79.

The success of the Plaintiff's viewpoint and content discriminatory enforcement challenge "is dependent on the factual evidence provided as to how the statutory scheme has in fact operated vis-á-vis [the Plaintiff]." *McGuire*, 386 F.3d at 62. The undisputed facts refute any assertion that the City enforced the Noise Provision based on the Plaintiff's viewpoint. The Plaintiff has failed to offer any evidence showing that the scheme was enforced in a discriminatory manner or constituted a "pattern of unlawful favoritism." *Id.* at 64; *see also Brown v. City of Pittsburgh*, 586 F.3d 263, 293 (3d Cir. 2009) (explaining that to prove a pattern of unlawful favoritism, a plaintiff "must prove not merely that the weight of [a municipality's] enforcement of [an ordinance] has tended to fall more heavily on those who advocate one viewpoint . . . than on those who advocate another;" rather, a plaintiff "must also prove that such enforcement occurred *because of* the viewpoint expressed"). Nor has Plaintiff shown that the police enforced the statute in a content-dependent way. As such, based on the undisputed facts, the City and the Attorney General are entitled to summary judgment on this claim.

## 2.    Prior Restraint

Count III of the Amended Complaint asserts that the Noise Provision represents an unconstitutional prior restraint on Mr. March's speech and has foreclosed his ability to convey his message. Am. Compl. ¶¶ 141–50. But again, the record belies his argument.[22]

The term "prior restraint" is "used to describe administrative and judicial orders forbidding certain communications when issued in advance of the time that such communications are to occur." *Alexander v. United States*, 509 U.S. 544, 550 (1993) (internal quotations and citation omitted). In practice, at the municipal level, prior restraints often take the form of "licensing [or] permit schemes" that require speakers to obtain permission in advance of certain speech or expression. *See New England Reg. Council of Carpenters v. Kinton*, 284 F.3d 9, 21 (1st Cir. 2002). Out of concern for "government censorship," *id.*, there is a "heavy presumption against [the] constitutional validity" of a prior restraint. *N.Y. Times v. United States*, 403 U.S 713, 714 (1971) (per curiam) (internal quotations omitted). And any permissible prior restraint must "contain adequate substantive and procedural safeguards against

---

[22]    The Plaintiff also alleges that the Noise Provision is not a valid time, place, and manner restriction as applied to him. Am. Compl. ¶ 132. In Count II, he specifically claims that he "cannot reach his intended audience at an audible volume" and that the "[s]tatute, as enforced by Defendants, has almost completely foreclosed [his] ability to communicate his message." Am. Compl. ¶¶ 136–37. The Plaintiff develops no argument as to why he is entitled to summary judgment on this particular count; in fact, he makes no mention of a "time, place, and manner" restriction in any of his briefing on these pending motions. Instead, he simply argues that the enforcement of the Noise Provision has foreclosed his ability to protest—an argument that appears in several of his claims. Because the First Circuit has held that the Noise Provision is a facially constitutional time, place, and manner restriction, and because I conclude that Mr. March has failed to show that it has been enforced unconstitutionally or has foreclosed his speech, the City and Attorney General are entitled to summary judgment on Count II as well.

arbitrary (or content-based) State action." *Kinton*, 284 F.3d at 21. The Plaintiff merely asserts that the Noise Provision imposes a prior restraint, but he makes no attempt to analyze the law or explain how his case fits within this legal doctrine.

Here, neither the City nor the Attorney General has imposed any requirement on Mr. March before he is permitted to protest outside of the Health Center. Rather, the City has taken action only after Mr. March was already protesting and after officers received complaints from Health Center employees. Moreover, at each such encounter, officers repeatedly assured Mr. March that they were not prohibiting him from protesting in a less disruptive manner, and video evidence shows that Mr. March continued to speak at a level clearly audible to people passing by. The record also shows that Mr. March continued to protest outside the Health Center at least twenty times between December of 2015 and April of 2016. Pl.'s Mot. Facts ¶ 120. Thus, according to the undisputed facts, the Noise Provision and the City's enforcement of it have not "completely ban[ned] Plaintiff from engaging in audible protected speech near the [Health Center]" or "foreclose[d] Plaintiff's ability to communicate orally with his fellow citizens near the [Health Center.]" Am. Compl. ¶¶ 144–45.

The First Circuit has already held that the Noise Provision is facially content neutral and serves a "significant state interest without burdening substantially more speech than necessary and while leaving open ample alternative avenues for communication." *March*, 867 F.3d at 69. If the statute provides alternative avenues and the City's apparent policy did not close off those avenues, as demonstrated by

Mr. March's own actions, it is unclear how either the City or the Attorney General enacted an unconstitutional prior restraint. Thus, the City and the Attorney General are entitled to summary judgment on this claim as well.

### B.     Equal Protection

Mr. March also asserts an equal protection claim, arguing that the City and the Attorney General have selectively enforced the Noise Provision against him based on his religion. Am. Compl. ¶¶ 151–57. As with his other claims, this claim is unsupported by the record. To prove an equal protection claim for selective enforcement, a plaintiff must show that "(1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person."[23] *Freeman v. Town of Hudson*, 714 F.3d 29, 38 (1st Cir. 2013) (internal quotations omitted). Although the "formula for determining whether individuals or entities are 'similarly situated' . . . is not always susceptible to precise demarcation," the "test is whether a prudent person, looking objectively at the incidents, would

---

[23]     In *McGuire*, the First Circuit noted the overlap between First Amendment and equal protection claims in the as-applied context, specifically when a plaintiff is challenging the enforcement of a statute that restricts speech. *See* 386 F.3d 62–64. The court explained that the "primary potential difference concerns the role of intent: in equal protection cases, plaintiffs must show that the relevant government actor intended to discriminate against the disfavored group." *Id.* at 63. The court noted that "[i]ntent, in this context, means more than mere knowledge by the government actor that a policy has a discriminatory effect." *Id.* Rather, "the government agent must have adopted the policy because of, and not despite, its discriminatory impact." *Id.* Explaining that such "[i]mpermissible intent is difficult to demonstrate" in a selective enforcement claim, the court declined to analyze such intent because it concluded that the plaintiffs' claims failed under the more lenient "pattern of unlawful favoritism" required for a successful First Amendment challenge. *Id.* at 62–64. I point out this distinction because Mr. March has identified no facts to support any discriminatory intent on the part of the City, its officers, or the Attorney General.

think them roughly equivalent and the protagonists similarly situated." *Aponte-Ramos v. Álvarez-Rubio*, 783 F.3d 905, 909 (1st Cir. 2015) (internal quotations omitted). "In other words, apples should be compared to apples." *Id.* (internal quotations omitted).

Although Mr. March repeatedly asserts that, "since its inception, the MCRA and its Noise Provision have only been enforced by Portland against pro-life protestors like Plaintiff and only upon complaints from Planned Parenthood," his argument that this translates into selective enforcement is speculative. Pl.'s Reply 4, 6. He contends, without citation to any fact, that "Planned Parenthood surgically wields the heckler's veto enshrined in Portland's policies against Plaintiff to silence him because they oppose the content of his pro-life message." Pl.'s Reply 4. He further speculates that "obviously, Planned Parenthood did not make any complaints against any of these other entities because Planned Parenthood is not opposed to the messages being expressed." Pl.'s Reply 4.

Simply put, Mr. March points to no evidence indicating that he was singled out because of his religion, or even that officers treated any other similarly situated person differently. Although Mr. March claims that officers and Health Center employees did not enforce the Noise Provision against other loud groups, such as climate change protesters, he fails to show that those groups were similarly situated. Am. Compl. ¶ 73; Pl.'s Mot. 10. As the videotapes reveal, the noise from the climate change protest is very different in character from Mr. March's preaching. *Compare* JSR Ex. 8, *with* JSR Ex. 2. In the videotape in Exhibit 8, a large group of young people

parade down the far side of Congress Street moving swiftly by the Health Center repeating in a cacophonous chorus: "What do we want? Climate action! When do we want it? Now!" In contrast, in the videotape in Exhibit 2, Mr. March stands on a soapbox on the sidewalk below the Health Center facing the windows of the Health Center, which are perhaps twelve feet above his head. His lone, penetrating voice can be heard over all others. The videotape, which shows only a portion of his protest, goes on for ten minutes and includes Mr. March's discussion with a passerby. At the end of the video, he states, "let's go back to the reading," suggesting that his protest continues.[24] There are no facts suggesting that other noisemakers, such as the climate protesters, were disrupting the provision of health services within the building. *See* Pl.'s Mot. Facts ¶¶ 129–134 (explaining that the City is not aware of receiving complaints that noise by other individuals or groups was interfering with the provision of health care services within the Health Center).

Mr. March identifies no instance where another speaker did not receive a warning after Health Center employees complained that the person was interfering with the provision of health services. Nor does he even argue that officers warned him without such a complaint from a Health Center employee. *See Buchanan v. Maine*, 469 F.3d 158, 178 (1st Cir. 2006) (explaining that a plaintiff "claiming an equal protection violation must first identify and relate specific instances where persons situated similarly in all relevant aspects were treated differently, instances

---

[24]    There is no evidence in the record that Health Center staff complained to the police on this occasion.

31

which have the capacity to demonstrate that [the plaintiff was] singled out for unlawful oppression") (internal quotations, alteration, and emphasis omitted). Rather, Mr. March merely speculates that Health Center employees only complained about him because of his message and religion. This speculation is insufficient at the summary judgment stage.

Section 1983 liability only arises when there has been a constitutional violation. *See Kennedy v. Town of Billerica*, 617 F.3d 520, 531 (1st Cir. 2010) (explaining that a municipality can only be liable for "identifiable constitutional violations attributable to official municipal policy"); *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point."). Even if I view the record in the light most favorable to him, Mr. March has failed to present any facts suggesting that his constitutional rights were violated. Thus, I conclude that the City and the Attorney General are entitled to summary judgment on Mr. March's viewpoint discrimination (Count I), prior restraint (Count III), and equal protection (Count IV) claims.[25]

### C.   Due Process Clause

The City and the Attorney General both move for summary judgment on Mr. March's claim that the Noise Provision is unconstitutionally vague, both facially and

---

[25]     Because I conclude that the City and the Attorney General are entitled to summary judgment on these claims, Mr. March's motion for summary judgment on these claims is denied.

as applied to him (Count V).[26] In his Complaint, Mr. March asserts that the Noise Provision "does not give fair notice to citizens" and "does not provide minimal standards to guide law enforcement." Am. Compl. ¶¶ 163–64. Specifically, Mr. March contends that "heard within a building" is not an objective standard because it varies based on other noise and weather conditions and because it cannot be independently known by a law enforcement officer. Am. Compl. ¶¶ 165–66.

In his motion for summary judgment, the Attorney General relies on ten cases to argue that the Noise Provision is not void for vagueness because, *inter alia*, the statute carries civil rather than criminal penalties, has a *mens rea* requirement, has a warning requirement, and creates an objective volume threshold for a violation. The City likewise argues that the Noise Provision "identifies the harm to be addressed," "requires a causal connection between the protected interest and certain forbidden conduct," and "requires proof of intent." City's Mot. 13 (ECF No. 163). Mr. March offers neither analysis nor case support in opposing the Attorney General or the City.[27] In the opening paragraph of his own motion, Mr. March asserts that he is

---

[26]    Mr. March made no vagueness challenge to the statute when the case was before the First Circuit. *See March*, 867 F.3d at 55 n.5.

[27]    Mr. March begins his opposition to the Attorney General's motion with an italicized subheading that states, "Whatever 'noise' Planned Parenthood chooses to complain about is not a lawful or constitutionally permissible standard by which to enforce the Maine Civil Rights Act against Plaintiff." Pl.'s Opp'n AG's Mot. 1 (ECF No. 169). But he did not put the flesh on the bones of this point. *See Rivera-Gomez v. de Castro*, 843 F.2d 631, 635 (1st Cir. 1976). His only statements on vagueness are, in his introduction section, "Plaintiff asserts . . . the Noise Provision is unconstitutionally vague," and, in his conclusion section, "the Noise Provision, *as applied* to Plaintiff . . . is unconstitutionally vague." Pl.'s Opp'n AG's Mot. 2, 6.
        In opposing the City's motion for summary judgment, Mr. March wrote in his introduction that "Plaintiff opposes Portland's Summary Judgment Motion and asserts that . . . the Noise Provision . . . is unconstitutionally vague," and in his conclusion section he wrote that "the Noise Provision, *as applied* to Plaintiff . . . is unconstitutionally vague." Pl.'s Am. Opp'n City's Mot. 1–2, 13.

moving for summary judgment against the City on his due process claim, but he develops no argument on this point until the final pages of his Reply brief. *See* Pl.'s Mot. 1; Pl.'s Reply 7–8. Even then, he makes unsupported and vague accusations, without any developed analysis or case support.[28]

"The vagueness doctrine, a derivative of due process, protects against the ills of laws whose 'prohibitions are not clearly defined.'" *Nat'l Org. for Marriage v. McKee*, 649 F.3d 34, 62 (1st Cir. 2011) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)). A statute is impermissibly vague if (1) "it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or (2) "it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). Out of concern for arbitrary suppression of free speech, "the Constitution requires a 'greater degree of specificity' in cases involving First Amendment rights." *McKee*, 649 U.S. at 62. Nevertheless, "mathematical certainty from our language" is impossible and unattainable. *See Grayned*, 408 U.S. at 110. Moreover, the Supreme Court has been more tolerant of enactments that impose civil—rather than criminal—penalties and ones that contain a scienter requirement. *See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498–99 (1982); *Hill*, 530 U.S. at 732 (explaining that concern about

---

[28]     Mr. March's cursory treatment of the vagueness issue in both his oppositions and own motion likely amounts to a waiver and entitles the Attorney General and the City to summary judgment. *See Grenier v. Cyanamid Plastics, Inc.*, 70 F.3d 667, 678 (1st Cir. 1995) (quoting *Vaughner v. Pulito*, 804 F.2d 873, 877 n. 2 (5th Cir. 1986)) ("[A]n issue raised in the complaint but ignored at summary judgment may be deemed waived. 'If a party fails to assert a legal reason why summary judgment should not be granted, that ground is waived.'"); *Vélez-Vélez v. P.R. Highway & Transp. Auth.*, 795 F.3d 230, 238 (1st Cir. 2015) (same).

proper notice can be "ameliorated by the fact that [the statute] contains a scienter requirement").

In *Grayned*, the Supreme Court upheld an "antinoise" ordinance challenged on vagueness grounds. 408 U.S. at 106. That ordinance prohibited persons from "willfully mak[ing] . . . any noise or diversion," while next to a school, that "disturbs or tends to disturb the peace or good order of such school session." *Id.* at 107–08. In holding that the ordinance was not unconstitutionally vague, the Supreme Court explained that any vagueness in these terms "is dispelled by the ordinance's requirements that (1) the 'noise or diversion' be actually incompatible with normal school activity; (2) there be a demonstrated causality between the disruption that occurs and the 'noise or diversion'; and (3) the acts be 'willfully' done." *Id.* at 113–14. The Court contrasted the ordinance with a "vague, general 'breach of the peace' ordinance," and noted that the antinoise ordinance was "written specifically for the school context, where the prohibited disturbances are easily measured by their impact on the normal activities of the school." *Id.* at 112. Although enforcement of the ordinance "require[d] the exercise of some degree of police judgment," that judgment was sufficiently "confined" because there must be "demonstrated interference with school activities." *Id.* at 114.

Similarly, in *Boos v. Barry*, the Supreme Court held that a statute that restricted congregations at embassies was not unconstitutionally vague because the

words and context of the statute "gave fair notice of its scope."[29]  485 U.S. 312, 332 (1988). As in *Grayned*, the Court explained that the "prohibited quantum of disturbance" need not be specified in the statute. *Id*. The statute in *Boos* was "crafted for a particular context and given that context, it [was] apparent that the 'prohibited context of disturbance' is whether normal embassy activities have been or are about to be disrupted." *Id*. Because the statute "communicate[d] its reach in words of common understanding," it survived the vagueness challenge. *Id*.

The words and context of the Noise Provision undermine Mr. March's argument that the statute authorizes arbitrary and discriminatory enforcement. Under the terms of the statute, noise that can be heard within the building and that is made intentionally to disrupt services within it is prohibited.[30]  As in *Grayned*, it is not merely the volume of the noise that is restricted.[31] Nor is it just the intent of the speaker. Rather, it is the combination of the two. *See March*, 867 F.3d at 67. And this is a reflection of the statute's purpose. When the First Circuit upheld the Noise Provision against Mr. March's earlier facial challenge, the court explained that the Noise Provision addressed a particular harm, namely interference with "safe and

---

[29]    Although the text of the statute appeared vague and overbroad, the Supreme Court adopted the narrowed interpretation applied by the appellate court. *Boos v. Barry*, 485 U.S. 312, 331–32 (1988).

[30]    I am not convinced by Mr. March's argument that "heard within a building" lacks objectivity. Just because the volume that meets that standard might change due to varying external conditions does not mean that it is subjective. Moreover, the fact that the audible volume might change merely reinforces the ineffectiveness of a strict decibel limit. Instead of imposing such a limit, the Noise Provision is tailored to address noise that actually can be heard within a building and then, within that, is targeted at a subset of noise that is meant to disrupt the health services within.

[31]    In *Grayned*, the Supreme Court explained that it is not the sheer volume level that determines whether a noise will be disruptive. Instead, any disturbance was to be measured by its impact on normal school activities. *See Grayned v. City of Rockford*, 408 U.S. 104, 112 (1972).

36

effective health care." *Id.* at 64–66. And the Noise Provision contemplates a "demonstrated causality" between the disruption of health care services and the noise. *See Grayned*, 408 U.S. at 113. It is thus "clear what the [Noise Provision] as a whole prohibits," even if isolated words or phrases might seem vague initially. *Id.* at 110 (finding ordinance constitutional even though certain words were "marked by flexibility and reasonable breadth, rather than meticulous specificity") (internal quotations omitted). As the First Circuit explained, the Noise Provision "target[s] a subset of loud noise that is likely to cause the 'unique' harm that Maine has a significant interest in singling out." *March*, 867 F.3d at 66.

In addition, other factors weigh against finding that the Noise Provision is impermissibly vague. First, it imposes no criminal penalty. *See Village of Hoffman Estates*, 455 U.S at 498–99 (explaining that the Supreme Court has "expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe"). Second, it contains both a warning requirement and a *mens rea* requirement. Officers must warn the speaker before issuing any citation. And a citation is only to be issued if the speaker intends to jeopardize the health of persons receiving services within the building or to interfere with the safe and effective delivery of those services. 5 M.R.S.A. § 4684-B(2)(D). These requirements ensure that no person will be punished for accidentally or unknowingly making such disruptive noise, and thus the statute does not act as "a trap for those who act in good faith." *Colautti v. Franklin*, 439 U.S. 379, 395 (1979) (internal quotations omitted); *see also Gonzales v. Carhart*, 550 U.S. 124, 149–150

(2007) (explaining that the Supreme Court "has made clear that scienter requirements alleviate vagueness concerns"). On the whole, I conclude that the Noise Provision is not unconstitutionally vague on its face.

Mr. March also asserts that the Noise Provision is unconstitutionally vague as applied to him. Specifically, he argues that the City's application of the Noise Provision against him "failed to provide him with a reasonable opportunity to understand what conduct was prohibited." Pl.'s Reply 7. However, during each interaction with Mr. March, officers gave guidance on how to comply with the Noise Provision. When officers formally warned Mr. March under the Noise Provision on November 6, 2015, they provided him with a copy of the statute, which I have just concluded sufficiently conveys what is prohibited and is not impermissibly vague. JSR Exs. 3 and 7. On December 4, 2015, Lt. Preis attempted to explain the Noise Provision's requirements, indicated that Mr. March's volume when speaking with him was not too loud, and recommended that Mr. March reach out to the Attorney General's office for more specific guidance. JSR Ex. 6. Finally, on December 11, 2015, after Mr. March asked Officer Hults whether there was a definitive volume he could speak at, Officer Hults replied that the volume Mr. March was speaking at then was "fine" and explained that it was only a problem when Mr. March was so loud that his voice could be heard inside the building. JSR Ex. 5. Each of these encounters demonstrates that officers repeatedly provided reasonable guidance to Mr. March on how to comply with the Noise Provision.

Again, at the summary judgment stage, Mr. March cannot just reassert his claims and disregard the undisputed facts that refute them. *See Cherkaoui*, 877 F.3d at 24 (explaining that the "nonmovant must provide sufficiently supported evidence, without relying upon mere allegation or denials of the movant's pleading, to establish a genuine issue for trial" and that the "plaintiff must offer significant probative evidence tending to support the complaint") (internal quotations and alterations omitted). Accordingly, the City and the Attorney General are entitled to summary judgment on the Plaintiff's unconstitutional vagueness claim.

## II.   Causation

In addition to identifying a deprivation of a federal right, a plaintiff bringing a § 1983 claim must also establish that "the defendant's conduct was a cause in fact of the alleged deprivation." *Soto*, 103 F.3d at 1062. Although I find that the Plaintiff has not established that he suffered any constitutional violation, I also conclude that his claims fail for the independent reason that he has not shown that the challenged conduct was attributable to either the Attorney General or the City.

### A.   Attorney General's Motion for Summary Judgment

The Attorney General argues that he is also entitled to summary judgment on Mr. March's constitutional claims because the Attorney General has not enforced the Noise Provision against Mr. March or caused the Noise Provision to be enforced against him. AG's Mot. 5–7 (ECF No. 162). Put another way, Mr. March attempts to bring an as-applied challenge against a party who has not applied the law to him. Mr. March responds that the Attorney General is the only state actor responsible for prosecuting and exercising prosecutorial discretion over reported violations of the

Noise Provision, and he cites a Maine Superior Court case where the Attorney General brought an action against another protester. Pl.'s Opp'n AG's Mot. 4–5 (ECF No. 169). Mr. March also maintains that "Portland must work in concert with" the Attorney General to enforce the Noise Provision because the Attorney General prosecutes violations. Pl.'s Opp'n AG's Mot. 5.

It is undisputed that Mr. March has not been referred to the Attorney General, much less prosecuted by him. AG's Mot. Facts ¶ 13. Moreover, the Attorney General's office had no conversations about Mr. March's protests with the City of Portland, its Police Department, or Health Center employees. AG's Mot. Facts ¶ 19. The record does not show that the Attorney General was involved in the application of the Noise Provision to Mr. March in any way. In the absence of either legal authority or disputed facts about the Attorney General's role in applying or coordinating the application of the Noise Provision, I conclude that there is no evidence that the Attorney General caused a deprivation of Mr. March's free speech or equal protection rights. Accordingly, even if Mr. March could establish a constitutional violation, the Attorney General would be entitled to summary judgment on Mr. March's as-applied free speech and equal protection claims.

### B.    Motions for Summary Judgment on Claims Against the City

As discussed above, Mr. March faces an additional hurdle in attempting to hold the City liable for any constitutional violation under § 1983. In particular, he must show that "official municipal policy of some nature caused [the] constitutional tort." *Monell*, 436 U.S. at 691. This means that at trial Mr. March "bears the burden of showing that, 'through its *deliberate* conduct, [the City] was the moving force behind

the injury alleged.' " *Haley v. City of Boston*, 657 F.3d 39, 51 (1st Cir. 2011) (quoting *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 530 U.S. 397, 404 (1997)) (internal quotation omitted). In other words, there must be "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *see also Young*, 404 F.3d at 26 (emphasizing that (1) "the municipal policy or custom [must] actually have caused the plaintiff's injury" and (2) "the municipality [must have] possessed the requisite level of fault, which is generally labeled in these sorts of cases as 'deliberate indifference' ") (citations omitted). [32]

---

[32]    The First Circuit has not decided whether, and in what circumstances, municipal enforcement of state law can be a municipal policy under § 1983. *See Martin v. Gross*, 340 F. Supp. 3d 87, 99 (D. Mass. 2018). A concurrence in *Yeo v. Town of Lexington*, suggests that a municipal policy that is taken in "good faith reliance upon state law . . . cannot give rise to municipal liability under § 1983." 131 F.3d 241, 257 (1st Cir. 1997) (Stahl, J., concurring) (citing *Surplus Store & Exch., Inc. v. City of Delphi*, 928 F.2d 788, 791–92 (7th Cir. 1991)).

In *Snyder v. King*, the Seventh Circuit rejected § 1983 municipal liability where a county voter registration board, acting pursuant to state law, removed an individual convicted of a misdemeanor from the voter rolls. 745 F.3d 242, 243–44 (7th Cir. 2014). The court held that there was no "direct causal link" between a county policy and any deprivation of federal right because "the only local government 'policy' at issue [was] general compliance with the dictates of state law." *Id.* at 247. The court relied in part on *Surplus Store & Exchange, Inc. v. City of Delphi*, in which the Seventh Circuit wrote, "It is difficult to imagine a municipal policy more innocuous and constitutionally permissible, and whose causal connection to the alleged violation is more attenuated, than the 'policy' of enforcing state law." 928 F.2d at 791.

However, in *Vives v. City of New York*, the Second Circuit held that the existence of a municipal policy depends on "(1) whether the City had a meaningful choice as to whether it would enforce [the statute in question]; and (2) if so, whether the City adopted a discrete policy to enforce [the statute in question] that represented a conscious choice by a municipal policymaker." 524 F.3d 346, 353 (2d Cir. 2008); *see also Martin*, 340 F. Supp. 3d at 99. Mr. March has not developed any argument as to whether the City had a "meaningful choice" to enforce the Noise Provision or whether the letters and emails reflected "a conscious choice" by the City to enforce the Noise Provision in a certain way. In fact, he makes no effort to distinguish this case from *Snyder* or to liken it to any other relevant case. However, for the sake of deciding these motions for summary judgment, I assume that the City had some policy or custom in place.

Mr. March asserts that the various letters and emails from City officials constitute a municipal policy[33] that:

> it is *good enough* for Planned Parenthood to merely allege that they heard noise within the Planned Parenthood facility (a misinterpretation of the MCRA) and at most to offer a *notion* that any alleged noise is somehow affecting undisclosed medical procedures being administered to unnamed patients within an unidentified section of the Planned Parenthood facility (also a misinterpretation of MCRA).

Pl.'s Mot. 10. The Plaintiff focuses in on the Planned Parenthood OT Detail Instructions distributed by Commander Rogers in January of 2016 as support for a City policy.[34] Those instructions state:

> If you are notified by PPH staff that someone is so loud they are interfering with the safe and effective delivery of health services you will need to warn the person who is too loud and explain to them what they are being warned for as well as the consequences for continuing. (you do not need to be the one to hear if it is too loud inside, if they say it is too loud that is good enough.)

JSR Ex. 22-A.

The City makes the persuasive point that these instructions could not have been the moving force behind any violation of the Plaintiff's rights because they were

---

[33]    The Plaintiff acknowledges that in order for the City to be held liable he would need to establish that the City had a policy or custom that was the "moving force" behind the violation of his constitutional rights or that a single decision by a municipal official with final policy-making authority constituted official policy. Pl.s' Mot. 8–10. The Plaintiff does not develop either an argument that the City had some custom that constituted municipal policy or an argument that someone with final policy-making authority made a decision that constituted City policy.

[34]    In his opposition to the City's motion, Mr. March appears to also argue that earlier letters and emails from Portland police officials adopted a policy of enforcing the Noise Provision whenever a protester's voice could be heard within the Health Center, whether or not the speech was interfering with the provision of health care services. *See* Pl.'s Am. Opp'n City's Mot. 6–7. Assuming that this is true and that those documents constituted a municipal policy, the Plaintiff's argument would still fail. There is no evidence that such a policy *caused* a constitutional violation because there is no evidence that officers enforced the Noise Provision against Mr. March without a complaint that he was in fact interfering with the provision of health care services.

42

not provided to the officers until January of 2016—a month after the last event alleged by Mr. March in his Amended Complaint. City's Opp'n 8 (ECF No. 173). Although I could hypothesize a scenario where these instructions memorialized a custom that developed among the officers of relying solely on the uncorroborated report of Health Center staff, the problem with this hypothetical argument is that it is not supported by the record.

The record contains evidence that Health Center staff complained about Mr. March on four occasions.

- On November 6, 2015, Officer Nadeau, after hearing Mr. March from at least half a block away, asked Mr. March to bring his volume down. Mr. March agreed to lower his volume, and he continued to speak at a level that was clearly audible to the people around him. JSR Exs. 3 and 4. Major Krier later gave Mr. March his only formal warning under the MCRA. JSR Ex. 7.

- On November 13, 2015, Lt. Preis and Officer Argitis responded to the Health Center to discuss a complaint made by Planned Parenthood staff that Mr. March could be heard within the examination room and was disturbing staff and unidentified patients. The report reflects that the protesters had moved on by the time the police arrived and indicates that Planned Parenthood staff could not indicate how their awareness of the protest "constituted an interference with their delivery of health care services." No further action was taken. JSR Ex. 19 at 14–16.

- On December 4, 2015, Officer Hults, after speaking with someone from Planned Parenthood told Mr. March that he was being too loud. Mr. March asked to speak to Officer Hults' supervisor. Lt. Preis[35] responded to the scene and told Mr. March that they were not telling him that he could not speak at all and that he did not appear to be speaking too loudly. Mr. March was allowed to continue speaking, and no further action was taken. JSR Ex. 6.

- On December 11, 2015, Officer Hults told Mr. March that Planned Parenthood staff could hear him from inside. Officer Hults indicated that he had also heard Mr. March from inside the Planned Parenthood offices. Officer Hults merely asked Mr. March to lower his volume. Mr. March was allowed to continue to speak at a level audible to those around him, and no further action was taken. JSR Ex. 5.

The facts simply do not establish a custom of enforcing the Noise Provision whenever Health Center staff complained, which is fatal to the theory that Commander Rogers's email reflected a preexisting custom by the Portland Police to enforce the Noise Provision on the say-so of Health Center staff.

---

[35] The Plaintiff could be asserting that Lt. Preis was acting pursuant to an unconstitutional City policy when Lt. Preis indicated that officers enforced the Noise Provision based on a "combination" of content and volume. JSR Ex. 6. There are two problems with this argument. First, Lt. Preis was articulating the standard that was subsequently endorsed by the First Circuit. *See March v. Mills*, 867 F.3d 46, 67 (1st Cir. 2017). Second, at the next encounter on December 11, 2015, Officer Hults reiterated that the City's focus was on the volume of the speaker. *See* JSR Ex. 5 (March: "[Lt. Preis] told me it was content and not volume. You're telling me its volume and not content. Who am I supposed to listen to?" Hults: "I think he flipped it. I don't know. But I'm saying it it's volume, and they can hear it, then it's a problem."). Mr. March has not developed any argument about how a one-off comment by Lt. Preis could subject the City to *Monell* liability—particularly when he has provided no evidence that Lt. Preis even acted based solely on the content of Mr. March's speech.

For similar reasons, to the extent that Mr. March is asserting that he was dissuaded from protesting because he feared enforcement of the Noise Provision, he fails to point to any City policy or action that could be said to have caused such fear. He admits that his claims "all arise out of" his interactions with Portland Police officers in November and December of 2015. Pl.'s Mot. Facts ¶ 71. Yet, at each encounter, officers gave specific guidance on how loud Mr. March could protest, always permitting him to continue protesting at a volume that could easily be heard by others on the street.

Moreover, as noted above, Mr. March continued to protest outside of the Health Center at least twenty times between December of 2015 and April of 2016. He offers no explanation as to why the November and December interactions—or any City policy—chilled his speech months later.[36] I decline to venture a guess. *See Rivera-Gomez v. de Castro*, 843 F.2d 631, 635 (1st Cir. 1988) ("Judges are not expected to be mindreaders. Consequently, a litigant has an obligation to spell out its arguments squarely and distinctly or else forever hold its peace.") (citations and internal quotation marks omitted).

---

[36]     Moreover, Mr. March has not developed any argument that his speech was unconstitutionally chilled as a result of the January 2016 email from Commander Rogers. Mr. March points to no evidence that officers have acted pursuant to those instructions or even that he stopped protesting because of concerns about them. In fact, he states in his own statement of facts that he has ceased protesting outside of the Health Center because "he fears that if he continues to do so he will be prosecuted criminally or civilly," and he explains that this fear "is the result of actions taken by Portland police officers pursuant to Portland's policies for enforcing the MCRA in front of the [Health Center.]" Pl.'s Mot. Facts ¶¶ 69–70. As he identifies no actions taken by officers pursuant to an alleged policy that postdates the encounters identified in his Complaint, I decline to hypothesize that the January 2016 email itself caused him to cease protesting.

45

For these reasons, even if Mr. March could show that his constitutional rights were violated and even if he could show that the City had a discrete policy for enforcing the Noise Provision, he cannot establish that the City is liable under § 1983 because the undisputed facts establish that any such policy was not the cause of any such constitutional violation.

## CONCLUSION

For the reasons stated above, the Court **GRANTS** the Attorney General's motion for summary judgment (ECF No. 162), **GRANTS** the City of Portland's motion for summary judgment (ECF No. 163), and **DENIES** Mr. March's motion for summary judgment (ECF No. 165). Because I grant the Defendants' motions for summary judgment on all counts, the Clerk is directed to enter final judgment for the Defendants.

SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 28th day of April, 2020.

# APPENDIX A

## November 6, 2015 Encounter between Officer Nadeau and Mr. March

| | |
|---|---|
| March: | This is life and death. |
| Nadeau: | We're here because—only one of you really needs to take a picture. You don't need all three of you. |
| Unknown: | We want to make sure we get all the angles. |
| Nadeau: | Okay. We're here because they called in a complaint that they could hear you from the inside. |
| March: | I understand. |
| Nadeau: | I'm guessing it's probably you, right? |
| March: | I mean, I don't know. Maybe. |
| Unknown: | We're not inside, sir. We don't know. |
| Nadeau: | Okay. When I rolled up, I could hear you from back there, okay? |
| March: | Is there an actual noise ordinance? Do, do this for me. Give me an objective volume level that I can speak at. |
| Nadeau: | Unfortunately, there is no objective volume level. If they say they can hear it inside, in there, then that becomes a complaint. |
| March: | Is that, is that some ordinance or whatnot? |
| Nadeau: | Ya. |
| March: | So can I complain against them? |
| Nadeau: | For? |
| March: | For executing my fellow citizens. |
| Nadeau: | I already told you there's nothing I can do about that as a police officer. |
| March: | Okay. What's the First Amendment. I was born in Jamaica. What is it? |
| Nadeau: | You know what the First Amendment is. Okay? I'm just. I'm just talking to you. Okay? |
| March: | Alright, fair, fair. |
| Nadeau: | Is that fair? |
| March: | Alright, I apologize, I apologize. |
| Nadeau: | Do you think you could keep it down? |
| March: | Let's talk like men. Define to me what "keep it down" is. That's the question. Like you understand what I'm saying? I need an objective standard so that I can honor what you're saying, but then speak. |
| Nadeau: | If you can bring your voice down so that they can't hear you inside. |
| Unknown: | How do we know they can hear us inside? |
| March: | How do I know whether they can hear me or not? |
| Nadeau: | You can bring it down from where you're at right now or go from there. |
| March: | Do you believe that that's logical, that makes sense? |
| Nadeau: | Yeah. |
| Unknown: | That it's constitutional? |
| Nadeau: | I believe you can bring it down. |
| March: | Oh, I'm agreeing with you. What I'm saying is can't they just call you back and say they can still hear me? How can you quantify that? I'm not trying to play with you . . . I'm just sayin'. . . |
| Nadeau: | Okay. Okay. |
| March: | Let's work with each other. |
| Nadeau: | Listen, listen I'm here for a noise complaint. |
| March: | I hear you. |
| Nadeau: | They say that they can hear you. |
| March: | I understand, |
| Nadeau: | See where I'm coming from? |

| | |
|---|---|
| March: | No, I get you, bro. I get you. |
| Nadeau: | I'm not trying to give you a hard time. I'm not trying to move you guys out of here. I know you guys have to be here. |
| March: | I do. |
| Nadeau: | But when they call in a complaint, I have to come talk to you. |
| March: | I'm with you. |
| Nadeau: | Okay? |
| March: | Okay, what I'm saying is, what I'm saying is, give me a way to continue to speak my convictions while honoring what you're saying. |
| Nadeau: | Just bring your voice down a little. Can you do that? |
| March: | Okay. Roger that. I will bring my voice down a little. |
| Nadeau: | Okay. Is that good? |
| March: | I will do that. |
| Nadeau: | Can I get your name? |
| March: | I will do that for you. |
| Nadeau: | Wanna give me your name? |
| March: | No, I don't wanna to that. |
| Nadeau: | Okay. Thank you for your time sir. |
| March: | Hey, let me ask you one more question. |
| Nadeau: | What's that? |
| March: | Actually, two more questions. Couldn't they lie and say they can still hear me and you would have to come back here? |
| Nadeau: | I'm sure they could, yes. |
| March: | So then what is the point of this entire discussion? |
| Nadeau: | The point is . . . |
| March: | Because you and I both know they just want to silence us. |
| Nadeau: | Yes. I know that. And so I'm just talking to you. |
| March: | So, what I'm saying is what's the point of the discussion because as soon as you leave, you know, it doesn't matter if I'm whispering, they're still going to say that they can hear me. |
| Nadeau: | When somebody comes to make a complaint to me, I have to talk to the other person. |
| March: | Let me ask you one last question. |
| Nadeau: | What's that? |
| March: | What's being aborted up there? |
| Nadeau: | You know I can't help you with that. |
| March: | I don't need your help. I just . . . |
| Nadeau: | There's nothing I can do as a police officer. |
| March: | I'm not saying you can do anything. I'm just saying can you answer the question? |

[Officer Nadeau walks away]

# APPENDIX B

## November 6, 2015 Encounter between Major Krier and Mr. March

| | |
|---|---|
| Krier: | I just |
| March: | I wasn't warned about anything. He said he was just asking me for a favor. |
| Krier: | Oh. Well . . . |
| March: | Are you officially warning me now? |
| Krier: | About noise, ya. All's I'm doing is I'm letting you know what it's all about. This is the Maine Civil Rights Act. [Krier holds up paper] |
| March: | Um hmm. [March takes paper.] |
| Krier: | Okay, so that's straight from the law about what this is about, about why we are here. Nothing more than that. And, and . . . |
| March: | You took a, you took a class in criminal justice . . . |
| Krier: | I'm not going to get into |
| March: | No, no, no, let me finish, let me finish . . . |
| [unintelligible talking over one another] | |
| Krier: | That's the law. |
| March: | What I'm saying is I'm completely ignorant. So I need you to explain. |
| Krier: | Nope. |
| March: | Let me just, let me just . . . |
| Krier: | It's written so that you can understand. |
| March: | I can't. So I need you to define . . . |
| Krier: | No, you can talk to a lawyer. |
| March: | So, you're saying you're not going to define it. |
| Krier: | No, I'm not, no. |
| March: | You're just going to give me the paper and not going to explain it? |
| Krier: | That's correct, yes, because it's all self-explanatory. |
| March: | What does it mean to jeopardize the health of a person? |
| Krier: | You can talk to an attorney and get that. |
| March: | We have attorneys. I understand that. |
| Krier: | Okay. Then fine. Then you don't need me. You're all set. Thank you very much. |
| March: | Okay sir. Have a great day. God bless you. |
| [Major Krier walks away.] | |
| Unknown: | So is…was that a formal warning? |

49

# APPENDIX C

### December 4, 2015 Encounter between Lt. Preis and Mr. March

| | |
|---|---|
| Preis: | Hi Andrew. |
| March: | Hey, how's it going? |
| Preis: | Good. |
| March: | Long time no see. |
| Preis: | Lt. Preis. How are ya? Did you have any questions? They said you might have a question about the Maine Civil Rights Act? |
| March: | Well, what he said to me was, that, when the nice young lady complained about noise, I said, tell me how much I should speak because, surely, he's not telling me I can't speak at all? |
| Preis: | Absolutely not. |
| March: | Right, because we all know this is the United States. You believe in the Constitution. So, what I'm saying is, I asked the officer to tell me exactly how loud I should speak so that I could exercise my constitutional rights. You know what's ironic is I saw a bunch of kids about an hour ago, yelling about climate control and all that, and we were actually, you guys were actually helping them. So, it's curious to me, they were much louder than I was. We have that on video as well. |
| Preis: | Well, frankly, I don't think you are being very loud right now, based on what I'm seeing. |
| March: | I agree with you. I haven't changed my volume at all. |
| Preis: | Right. But the Maine Civil Rights Act does talk about if they can articulate that noise and specifically the type of speech and what's being said is interfering with a medical procedure, that's where the problem could be and that's very gray. You know what I mean? That's very gray. And I understand your frustration with that. |
| March: | I'm not frustrated at all. |
| Preis: | Well, I understand what you're saying that you hear other noise that's louder and that may be. It's not based on a decibel level. |
| March: | So, what you just said was the content of what I am saying is really the problem. |
| Preis: | It's a combination. And if they can—the complainant can articulate that its interfering with . . . |
| March: | Officer Preis [mispronounces] |
| Preis: | Preis. |
| March: | Preis, my apologies. What you just said to me was that it is not necessarily my volume level because we just conceded that there was a parade here . . . |
| Preis: | That's correct. |
| March: | filled with hundreds of kids which must have outdid me. But it's the content of what I'm saying. |
| Preis: | There, there is, there is, there is in the Maine Civil Rights Act, language that articulates that if what somebody, the noise that somebody's making, which could be content, interferes with the ability of somebody to deliver medical services that could be a problem. I'm not saying you're doing that. I'm just letting you know that those are the things that we're dealing with and I know you're somewhat familiar that the Attorney General was investigating another |

|          |                                                                                                                                                                                                                                                      |
|----------|--------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|          | gentleman out here, rightly or wrongly, you know, I can't give an opinion on that. I'm just telling you what's happening. And so . . .                                                                                                                 |
| March:   | Look, listen, listen I understand the position that you're in.                                                                                                                                                                                        |
| Preis:   | It's not a simple one.                                                                                                                                                                                                                                |
| March:   | You gotta do your job.                                                                                                                                                                                                                                |
| Preis:   | Ya.                                                                                                                                                                                                                                                   |
| March:   | But here's the deal, I gotta do my job. But here's what I'm saying to you.                                                                                                                                                                            |
| Preis:   | Sure.                                                                                                                                                                                                                                                 |
| March:   | There is no way in the world as far as when you put content into the equation there is no way in the world that she's gonna be happy with the content of what I'm saying. [unintelligible] against her organization.                                    |
| Preis:   | Right.                                                                                                                                                                                                                                                |
| March:   | So, so what I'm saying is we have got to find an objective means for me to exercise my right of free speech and honor you at the same time.                                                                                                           |
| Preis:   | I agree with you.                                                                                                                                                                                                                                     |
| March:   | That's what I have been asking for for weeks. I've been absolutely imploring you, begging you, please tell me what I can do so that you don't have to keep getting put in these situations. I'm sure you didn't join the force so that you can harass me. |
| Preis:   | And I hope you don't feel like I'm harassing you because that's not my intent at all. I'm just talking.                                                                                                                                                |
| March:   | Like I said, we're both two guys in a situation where it's kind of an impossible situation. Because I understand that the minute she says something that you have to go and whatnot. I understand.                                                       |
| Preis:   | Well, have you reached out to the Attorney General's Office at all? Talked to them?                                                                                                                                                                     |
| March:   | I'm not going to comment on that.                                                                                                                                                                                                                     |
| Preis:   | Okay. That would be something that I would recommend if you're trying to come up with something, a middle ground, that, not even a middle ground, that's not a good way to say it.                                                                      |
| March:   | [Greets passerby.] Go ahead, I'm sorry. I'm sorry.                                                                                                                                                                                                    |
| Preis:   | That would be something I would suggest. Maybe you talking to the Attorney General's office and work something out if you can.                                                                                                                          |
| March:   | Well, well, we're going to work something out, for sure. What I'm asking you guys is tell me what I can do to honor your request because I'm not going to stop speaking.                                                                                |
| Preis:   | Alright. I understand.                                                                                                                                                                                                                                |
| March:   | So, so, so I got deployed here by King Jesus. I gotta talk, right? So you're deployed somewhere, you gotta go . . . it's the same thing with me. So, I need you to explain to me what I can do right now in the next five minutes because I'm not going to stop. |
| Preis:   | What you're doing right now [video ends midsentence].                                                                                                                                                                                                 |

## APPENDIX D

### December 11, 2015 Encounter between Officer Hults and Mr. March

| | |
|---|---|
| March: | What's up officer? |
| Hults: | You're being heard upstairs so they want you to quiet down a little, okay? |
| March: | Whose they? |
| Hults: | Meredith and also there's a patient up there too. I can't give you her name, so, it's a HIPAA thing. Alright, so, I'm just going to ask you to quiet down, okay? |
| March: | Let me try to understand this. There's a woman up there about to murder her child, and they're, they're upset at me because they can hear me? |
| Hults: | Yup. They can just hear you upstairs. |
| March: | Okay, Officer Hults, do I have the freedom of speech in my nation? |
| Hults: | You do. But I already told you it's not content, it's volume. That's what we're concerned with right here. |
| March: | Well, you remember, you remember when Preis came here right? |
| Hults: | When who? |
| March: | Preis, you're supervisor. |
| Hults: | Yes, I remember. |
| March: | He told me the exact opposite, didn't he? |
| Hults: | Right now, what's going on is a gray area, and, yeah, we can't, right now with the current situation we're having is fine, but when they can hear you upstairs and we get a complaint, we just have to ask you to quiet down. |
| March: | Hults, Hults, you remember that Preis told me the exact opposite of what you told me? |
| Hults: | What did he tell you, do you remember? |
| March: | He told me it was content and not volume. You're telling me its volume and not content. Who am I supposed to listen to? |
| Hults: | I think he flipped it. I don't know. But I'm saying if it's volume, and they can hear it, then it's a problem. |
| March: | You're telling me that I need to restrict my civil rights because they're complaining about it, is that what you're saying? |
| Hults: | I'm asking you to quiet down, that's all. |
| March: | I'm saying, are you telling me to restrict my civil rights? |
| Hults: | I'm not telling you. I'm just asking you to quiet down. |
| March: | What happens if I don't quiet down? |
| Hults: | I write up a report, we take a complaint, it goes to the Attorney General. Easy as that. |
| March: | I'm not going to quiet down, Officer Hults, unless you tell me a definitive volume level that I need to speak at. |
| Hults: | No. |
| March: | Is there a definitive volume level that I can speak at? |
| Hults: | Right now is fine. |
| March: | Okay, well, I'm just going to keep going. |
| Hults: | Sure, go for it. |
| March: | I get harassed every week by them. I don't have any hard feelings against you Officer Hults. But honestly, every single week I get harassed by you guys. [March's volume is increasing.] All I'm trying to do is exercise my civil rights. That's all I'm trying to do. Now what's |

|          | interesting to me is that they call this thing, what is it, the Maine Civil Rights Act, or whatever? And you're using the Maine Civil Rights Act to deny me of my civil rights. You don't see the irony in that? |
|----------|---|
| Hults:   | I'm not using it, because I haven't done anything about it yet. I'm just asking you to quiet down. Cause I also said though, we don't really use this law too much, but there is a thing called disorderly conduct and that's using loud noise in a private/public place that can be heard in a private/public place. That's actually a crime. |
| March:   | Are you, are you threatening me? |
| Hults:   | I'm not threatening you, no. |
| March:   | Oh. |
| Hults:   | I'm just saying we haven't asked, we haven't been told to go down that route yet, okay, but if it's loud . . . |
| March:   | Why |
| Hults:   | if it's loud enough |
| March:   | Why are you even bringing it up if you're not threatening me with it? |
| Hults:   | I'm not threatening you. Do you feel threatened? |
| March:   | Well, I feel harassed to be honest with you. |
| Hults:   | Okay. |
| March:   | Cause every week I come out here, and then every week you tell me to quiet down, then I say what exactly do I need to say and then you never tell me. |
| Hults:   | You can say whatever you want, okay? But it's just—if you do it loud enough that's when it's a problem. |
| March:   | Okay, well and then you're not giving me an actual volume level. |
| Hults:   | I've already explained to you that we don't have any definitive volume level, but if someone else can hear it, especially in the building that's upstairs, that's when it's a problem. Because it's not just an office, but it's residences too. That's the issue, okay? |
| March:   | Well it's interesting to me that you never talk until the lady in the blue comes down. |
| Hults:   | I don't [unintelligible] enforce it until I have a complaint. That's how it works. |

[passerby speaks with Officer Hults]

| March:   | By the way, what time is it? Whose got a watch: |
|----------|---|
| Hults:   | 11:18 |
| March:   | Well, you know, my stop time is 11:30, so until you give me something definitive, I'm going to keep going. But I really—I really wish you'd give me something definitive so we could continue because this is amazing. I have got civil rights to speak. You're impeding on my civil rights, you realize that? |
| Hults:   | No, I'm not. |
| March:   | Okay. |
| Hults:   | I'm just asking you to quiet down. I'm not telling you to stop talking; I'm just asking you if you can not be loud. It's that easy. |
| March:   | Well I don't . . . |
| Hults:   | That's pretty reasonable. |
| March:   | I don't think I'm being, I don't think I'm being too loud. You know, we've had this conversation before. These individuals, I'm always gonna be too loud for these individuals. |
| Hults:   | I get that. But the thing is that . . . |
| March:   | You get that? |

Hults:      Well because we're right next to each other, yeah, I understand that. When I go upstairs, I can hear you. That's when it's a problem. [Unintelligible]. People who have to move back because they're having an exam right in this other room [gestures], and they don't feel comfortable because they can hear you. You are being distracting.

March:      Well, you're agreeing with me that they are never going to be comfortable with anything I'm saying or how loud I'm saying. You and I both know they want me off the street, period. Right?

Hults:      You know, you're probably, yeah. They probably just want you gone, but they're . . .

March:      So officer, if I lower my tone and they come out here again, and you tell me to lower my tone again, when is it going to stop?

Hults:      I don't know man. I really don't know.

March:      See what I'm saying?

Hults:      I do.

March:      They, so they constantly come down here no matter what my tone is, right?

Hults:      If I go up there and I can't hear anything, I can say, 'you know what, I don't see a problem right here.'

March:      Hults, you came out here and gave me the thumbs up twenty minutes ago.

Hults:      No, I asked you like I was doing the signal. Remember the signal [gestures with his hand] we have, the thing we had arranged?  Okay, this is not, this is a little bit too loud because they were complaining.

March:      I got ten minutes left.

Hults:      Okay.

March:      You're just going to have to deal with me for the next ten minutes.

Hults:      No problem.

March:      But we really gotta figure this out man.

Hults:      Okay, we can try.

March:      I'm trying, I'm working with you man. I just . . . a little frustrating.

Hults:      I appreciate it. I appreciate it.

[End of video.]